Amy **COHEN**, et al., Plaintiffs, Appellees,

v.

**BROWN UNIVERSITY**, et al., Defendants, Appellants.

No. 92–2483.

United States Court of Appeals, First Circuit.

Heard Feb. 4, 1993.

Decided April 16, 1993.

Jeffrey S. Michaelson, with whom Julius C. Michaelson, Michaelson & Michaelson, and Beverly E. Ledbetter, Providence, RI, were on brief, for defendants, appellants.

Lynette Labinger, with whom Roney & Labinger, Providence, RI, Sandra L. Duggan, Kronfeld, Newberg & Duggan, Philadelphia, PA, Arthur H. Bryant, Trial Lawyers for Public Justice, P.C., Washington, DC, Raymond Marcaccio, Blish & Cavanagh, Amato A. DeLuca, and Mandell, DeLuca & Schwartz, Ltd., Providence, RI, were on brief, for plaintiffs, appellees.

Linda S. Stein, Margaret M. Clark, Steptoe & Johnson, Ellen J. Vargyas, Washington, DC, and Deborah L. Brake, Fort Thomas, KY, on brief for Nat. Women's Law Center, Woman's Sports Foundation, and Nat. Ass'n for Girls and Women in Sport, amici curiae.

Before SELYA, CYR and STAHL, Circuit Judges.

SELYA, Circuit Judge.

In this watershed case, defendants-appellants Brown University, Vartan Gregorian, and David Roach appeal from the district court's issuance of a preliminary injunction ordering Brown to reinstate its women's gymnastics and volleyball programs to full intercollegiate varsity status pending the resolution of a Title IX claim.[1] *See Cohen v. Brown Univ.*, 809 F.Supp. 978 (D.R.I. 1992). After mapping Title IX's rugged legal terrain and cutting a passable swath through the factual thicket that overspreads the parties' arguments, we affirm.

## I. BROWN ATHLETICS: AN OVERVIEW

College athletics, particularly in the realm of football and basketball, has traditionally occupied a prominent role in American sports and American society. For college students, athletics offers an opportunity to exacuate leadership skills, learn teamwork, build self-confidence, and perfect self-discipline. In addition, for many student-athletes, physical skills are a passport to college admissions and scholarships, allowing them to attend otherwise inaccessible schools. These opportunities, and the lessons learned on the playing fields, are invaluable in attaining career and life successes in and out of professional sports.

The highway of opportunity runs in both directions. Not only student-athletes, but universities, too, benefit from the magic of intercollegiate sports. Successful teams generate television revenues and gate receipts which often fund significant percent-

---

1. The individual defendants are, respectively, the President and Athletic Director of the University. Each is sued in his official capacity. For ease in reference, we discuss this appeal as if Brown was the sole defendant and appellant. Nonetheless, our opinion applies equally to all parties.

ages of a university's overall athletic program, offering students the opportunity to partake of sports that are not financially self-sustaining. Even those institutions whose teams do not fill the grandstands of cavernous stadiums or attract national television exposure benefit from increased student and alumni cohesion and the support it engenders. Thus, universities nurture the legends, great or small, inhering in their athletic past, polishing the hardware that adorns field-house trophy cases and reliving heroic exploits in the pages of alumni magazines.

In these terms, Brown will never be confused with Notre Dame or the more muscular members of the Big Ten. Although its football team did play in the 1916 Rose Bowl and its men's basketball team won the Ivy League championship as recently as 1986, Brown's athletic program has only occasionally achieved national prominence or, for that matter, enjoyed sustained success.[2] Moreover, at Brown, as at most schools, women are a relatively inconspicuous part of the storied athletic past. Historically, colleges limited athletics to the male sphere, leaving those few women's teams that sprouted to scrounge for resources.

The absence of women's athletics at Brown was, until 1970, an ineluctable consequence of the absence of women; Brown sponsored a women's college—Pembroke—but did not itself admit women. In 1971, Brown subsumed Pembroke. Brown promptly upgraded Pembroke's rather primitive athletic offerings so that by 1977 there were fourteen women's varsity teams. In subsequent years, Brown added only one distaff team: winter track. Hence, in the 1991–92 academic year, Brown fielded fifteen women's varsity teams—one fewer than the number of men's varsity teams.

## II. THE PLAINTIFF CLASS

In the spring of 1991, Brown announced that it, like many other schools, was in a financial bind, and that, as a belt-tightening measure, it planned to drop four sports from its intercollegiate varsity athletic roster: women's volleyball and gymnastics, men's golf and water polo. The University permitted the teams to continue playing as "intercollegiate clubs," a status that allowed them to compete against varsity teams from other colleges,[3] but cut off financial subsidies and support services routinely available to varsity teams (e.g., salaried coaches, access to prime facilities, preferred practice time, medical trainers, clerical assistance, office support, admission preferences, and the like). Brown estimated that eliminating these four varsity teams would save $77,813 per annum, broken down as follows: women's volleyball, $37,127; women's gymnastics, $24,901; men's water polo, $9,250; men's golf, $6,545.

Before the cuts, Brown athletics offered an aggregate of 328 varsity slots for female athletes and 566 varsity slots for male athletes. Thus, women had 36.7% of the athletic opportunities and men 63.3%. Abolishing the four varsity teams took substantially more dollars from the women's athletic budget than from the men's budget, but did not materially affect the athletic opportunity ratios; women retained 36.6% of the opportunities and men 63.4%. At that time (and for a number of years prior thereto), Brown's student body comprised approximately 52% men and 48% women.

Following Brown's announcement of the cutbacks, disappointed members of the women's volleyball and gymnastics teams brought suit. They proceeded on an implied cause of action under Title IX, 20 U.S.C. §§ 1681–1688 (1988). *See Franklin v. Gwinnett County Pub. Sch.*, —— U.S.

---

**2.** We note, not without a certain irony, that the now-demoted women's volleyball and gymnastics teams won Ivy League championships in 1988 and 1990, respectively.

**3.** As a practical matter, many schools with varsity squads are reluctant to compete against club

teams. This case aptly illustrates the point. As soon as Brown demoted its women's volleyball team from varsity to club status, Northeastern University and West Point declined to include Brown on future volleyball schedules. *See Cohen*, 809 F.Supp. at 993.

——, ——, 112 S.Ct. 1028, 1032, 117 L.Ed.2d 208 (1992) (recognizing implied private right of action under Title IX); *Cannon v. University of Chicago*, 441 U.S. 677, 717, 99 S.Ct. 1946, 1968, 60 L.Ed.2d 560 (1979) (same); *see also Cannon*, 441 U.S. at 687 n. 8, 99 S.Ct. at 1952 n. 8 (holding that exhaustion of administrative remedies is not a prerequisite to a Title IX suit). The plaintiffs charged that Brown's athletic arrangements violated Title IX's ban on gender-based discrimination, a violation that was allegedly exacerbated by Brown's decision to devalue the two women's programs without first making sufficient reductions in men's activities or, in the alternative, adding other women's teams to compensate for the loss.

On plaintiffs' motion, the district court certified a class of "all present and future Brown University women students and potential students who participate, seek to participate, and/or are deterred from participating in intercollegiate athletics funded by Brown." And, after hearing fourteen days of testimony from twenty witnesses, the judge granted a preliminary injunction requiring Brown to reinstate the two women's teams pending the outcome of a full trial on the merits. *See Cohen*, 809 F.Supp. at 1001. We stayed execution of the order and expedited Brown's appeal.

## III. TITLE IX AND COLLEGIATE ATHLETICS

Title IX prohibits gender-based discrimination by educational institutions receiving federal financial support—in practice, the vast majority of all accredited colleges and universities. The statute sketches wide policy lines, leaving the details to regulating agencies. Since this appeal demands that we invade *terra incognita*,[4] we carefully recount the developments leading to the present version of Title IX and then examine the pertinent statutory and regulatory language.

### A. Scope of Title IX.

At its inception, the broad proscriptive language of Title IX caused considerable consternation in the academic world. The academy's anxiety chiefly centered around identifying which individual programs, particularly in terms of athletics, might come within the scope of the discrimination provision, and, relatedly, how the government would determine compliance. The gridiron fueled these concerns: for many schools, the men's football budget far exceeded that of any other sport, and men's athletics as a whole received the lion's share of dedicated resources—a share that, typically, was vastly disproportionate to the percentage of men in the student body.

Part of the confusion about the scope of Title IX's coverage and the acceptable avenues of compliance arose from the absence of secondary legislative materials. Congress included no committee report with the final bill and there were apparently only two mentions of intercollegiate athletics during the congressional debate. *See* 118 Cong.Rec. 5,807 (1972) (statement of Sen. Bayh on privacy in athletic facilities); 117 Cong.Rec. 30,407 (1971) (statement of Sen. Bayh noting that proposed Title IX will not require gender-blended football teams). Nevertheless, under congressional direction to implement Title IX, the Secretary of Health, Education and Welfare (HEW) promulgated regulations in 1975 which included specific provisions for college athletics. Four years later, HEW's Office of Civil Rights (OCR) added another layer of regulatory exegesis when, after notice and comment, it published a "Policy Interpretation" that offered a more de-

---

**4.** Although there has been a spate of sports-related Title IX suits during the last two years, *see* Andrew Blum, *Athletics in the Courts*, Nat'l L.J., Apr. 5, 1993, at 1, few have been fully litigated. *See, e.g.,* Carol Herwig, *Massachusetts Reinstates Women's Sports,* USA Today, Oct. 22, 1992, at 14C (announcing agreement to reinstate three women's teams at the University of Massachusetts and reporting the school's intention to become "the first university in the country to come into full compliance with Title IX"). While the case we decide today is apparently the first of these to reach the courts of appeals, others are pending. *See, e.g., Roberts v. Colorado State Univ.,* No. 93–1052 (10th Cir.1993) (not yet argued); *Cook v. Colgate Univ.,* No. 92–9175 (2d Cir.1993) (argued Feb. 26, 1993).

tailed measure of equal athletic opportunity.

In 1984, the Supreme Court radically altered the contemporary reading of Title IX. The Court held that Title IX was "program-specific," so that its tenets applied only to the program(s) which actually received federal funds and not to the rest of the university. *Grove City College v. Bell*, 465 U.S. 555, 574, 104 S.Ct. 1211, 1221, 79 L.Ed.2d 516 (1984). Because few athletic departments are direct recipients of federal funds—most federal money for universities is channelled through financial aid offices or invested directly in research grants—*Grove City* cabined Title IX and placed virtually all collegiate athletic programs beyond its reach.[5]

In response to *Grove City*, Congress scrapped the program-specific approach and reinstated an institution-wide application of Title IX by passing the Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687 (1988). The Restoration Act required that if any arm of an educational institution received federal funds, the institution as a whole must comply with Title IX's provisions. *See id.; see also* S.Rep. No. 64, 100th Cong., 2d Sess. 4 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3, 6 (explaining that Congress wanted to prohibit discrimination throughout an institution if the institution received any federal funds). Although the Restoration Act does not specifically mention sports, the record of the floor debate leaves little doubt that the enactment was aimed, in part, at creating a more level playing field for female athletes. *See, e.g.,* 130 Cong.Rec. S12,642 (daily ed. Oct. 2, 1984) (statement of Sen. Byrd decrying past discrimination against female athletes); 130 Cong.Rec. S11,253 (daily ed. Sept. 17, 1984) (statement of Sen. Hatch regarding importance of Title IX to ensuring development of women athletes); 130 Cong.Rec. S2,267 (daily ed. Mar. 2, 1984)

(statement of Sen. Riegle noting extensive evidence of sex discrimination in education and athletics).

The appellants do not challenge the district court's finding that, under existing law, Brown's athletic department is subject to Title IX. Accordingly, we devote the remainder of Part III to deterrating the meaning of Title IX, looking first at the statute and then at the regulations.

## B. *Statutory Framework.*

 Title IX, like the Restoration Act, does not explicitly treat college athletics.[6] Rather, the statute's heart is a broad prohibition of gender-based discrimination in all programmatic aspects of educational institutions:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance....

20 U.S.C. § 1681(a) (1988). After listing a number of exempt organizations, section 1681 makes clear that, while Title IX prohibits discrimination, it does not mandate strict numerical equality between the gender balance of a college's athletic program and the gender balance of its student body. Thus, section 1681(a) shall not

be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community, State, section, or other area: *Provided,* That this subsec-

---

**5.** Following the Court's decision in *Grove City,* the United States Department of Education (which by then had been spun off from HEW, *see infra* Part III(C)) dropped or curtailed seventy-nine ongoing Title IX cases. *See Statements on Civil Rights Restoration Act,* Daily Lab. Rep. (BNA) No. 53, at D1 (Mar. 20, 1981).

**6.** This lacuna apparently results from a political compromise. After the Conference Committee deleted an amendment to Title IX that would have exempted "revenue-producing" athletics, Congress asked the Secretary of HEW to provide regulations specifically governing athletics. *See* 44 Fed.Reg. 71,413 (1979).

tion shall not be construed to prevent the consideration in any hearing or proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex.

20 U.S.C. § 1681(b) (1988). Put another way, a court assessing Title IX compliance may not find a violation *solely* because there is a disparity between the gender composition of an educational institution's student constituency, on the one hand, and its athletic programs, on the other hand.

■ That is not to say, however, that evidence of such a disparity is irrelevant. Quite the contrary: under the proviso contained in section 1681(b), a Title IX plaintiff in an athletic discrimination suit must accompany statistical evidence of disparate impact with some further evidence of discrimination, such as unmet need amongst the members of the disadvantaged gender.

### C. *Regulatory Framework.*

As we mentioned above, the Secretary of HEW, following Congress's instructions, promulgated regulations implementing Title IX in the pre–*Grove City* era. *See* 40 Fed.Reg. 24,128 (1975). Thereafter, in 1979, Congress split HEW into the Department of Health and Human Services (HHS) and the Department of Education (DED). *See* 20 U.S.C. §§ 3401–3510 (1988). In a wonderful example of bureaucratic muddle, the existing Title IX regulations were left within HHS's arsenal while, at the same time, DED replicated them as part of its own regulatory armamentarium. *Compare* 45 C.F.R. § 86 (1992) (HHS regulations) *with* 34 C.F.R. § 106 (1992) (DED regulations). Both sets of regulations were still in effect when the Restoration Act passed. They are identical, save only for changes in nomenclature reflecting the reorganization of the federal bureaucracy.

In short, like pretenders to the emirate of a deceased sheik, both HHS and DED lay an hereditary claim to this oasis which arises from the regulatory desert, asserting authority to enforce Title IX. Nevertheless, DED is the principle locus of ongoing enforcement activity. *See* 20 U.S.C. § 3441(a)(1) (transferring all education functions of HEW to DED); *see also* 20 U.S.C. § 3441(a)(3) (transferring education-related OCR work to DED). Therefore, like the parties, we treat DED, acting through its OCR, as the administrative agency charged with administering Title IX.[7]

■ Recognizing the agency's role has important practical and legal consequences. Although DED is not a party to this appeal, we must accord its interpretation of Title IX appreciable deference. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see also Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (noting that the Supreme Court "gives great deference to the interpretation given the statute by the officers or agency charged with its administration"). The degree of deference is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX. *See* Pub.L. No. 93–380, § 844, 88 Stat. 612 (1974); *see also Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782 (holding that where Congress has explicitly delegated responsibility to an agency, the regulation deserves "controlling weight"); *Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977); *Alvarez–Flores v. INS*, 909 F.2d 1, 3 (1st Cir.1990).

It is against this backdrop that we scrutinize the regulations and the Policy Interpretation.

1. *The Regulations.* DED's regulations begin by detailing Title IX's application to college athletics.[8] The regulations also rec-

---

7. From this point forward, we use the acronym "OCR" to refer to DED's Office of Civil Rights which took on the education-related portfolio of

HEW's Office of Civil Rights in May, 1980. *See* 20 U.S.C. § 3441(a)(3).

8. The regulations provide:

ognize, however, that an athletic program may consist of gender-segregated teams as long as one of two conditions is met: either the sport in which the team competes is a contact sport or the institution offers comparable teams in the sport to both genders. *See* 34 C.F.R. § 106.41(b).

Finally, whether teams are segregated by sex or not, the school must provide gender-blind equality of opportunity to its student body. The regulations offer a non-exclusive compendium of ten factors which OCR will consider in assessing compliance with this mandate:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

34 C.F.R. § 106.41(c) (1992).[9] The district court rested its preliminary injunction on the first of these ten areas of inquiry: Brown's failure effectively to accommodate the interests and abilities of female stu-

dents in the selection and level of sports. *See Cohen*, 809 F.Supp. at 994. Hence, this area is the most critical in terms of evaluating the charges against Brown (although it is also the most difficult to measure).

**2. *The Policy Interpretation.*** In the three years next following the initial issuance of the regulations, HEW received over one hundred discrimination complaints involving more than fifty schools. In order to encourage self-policing and thereby winnow complaints, HEW proposed a Policy Interpretation. *See* 43 Fed.Reg. 58,070 (1978). It then promulgated the Policy Interpretation in final form, *see* 44 Fed.Reg. 71,413 (1979), a matter of months before the effective date of the statute through which Congress, emulating King Solomon, split HEW. The parties are in agreement that, at DED's birth, it clutched the Policy Interpretation, and, as a practical matter, that appears to be the case.[10] *See, e.g.,* DED, *Title IX Athletics Investigator's Manual* 1, 2 (1990) (Manual); *see also* Complaint Letter from Regional Civil Rights Director, DED, to Dr. Martin Massengale, Chancellor, Univ. of Nebraska (July 10, 1989) (noting that DED "ha[s] followed the directions provided in the Policy Interpretation"); Complaint Letter from Regional Civil Rights Director, DED, to Dr. Charles A. Walker, Chancellor, Univ. of Arkansas (Sept. 1, 1989) (same). Although we can find no record that DED formally adopted the Policy Interpretation, we see no point to splitting the hair, particularly where the parties have not asked us to do so. Because this document is a considered interpretation of the regulation, we cede it sub-

---

No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.
34 C.F.R. § 106.41(a) (1992).

**9.** The same regulation also stipulates that:
Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but [DED]

may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.
34 C.F.R. § 106.41(c) (1992).

**10.** Congress clearly assigned HEW's regulatory duties in education to the nascent DED. *See* 20 U.S.C. § 3441. Moreover, in taking up its mantle, DED adopted exactly the regulation which the Policy Interpretation purported to interpret—sending an unmistakably clear signal of the agency's satisfaction with the Policy Interpretation.

stantial deference. *See Martin v. OSHRC,* 499 U.S. 144, ——-——, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991); *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988).

In line with the Supreme Court's direction that, "if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language," *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1918, 72 L.Ed.2d 299 (1982) (quoting *United States v. Price,* 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966)) (collecting cases) (brackets in original), the Policy Interpretation limns three major areas of regulatory compliance:[11] "Athletic Financial Assistance (Scholarships)," *see* 34 C.F.R. § 106.37(c); "Equivalence in Other Athletic Benefits and Opportunities," *see* 34 C.F.R. § 106.41(c)(2)–(10); and "Effective Accommodation of Student Interests and Abilities," *see* 34 C.F.R. § 106.41(c)(1). The court below, *see Cohen,* 809 F.Supp. at 989, and a number of other district courts, *see, e.g., Roberts v. Colorado State Univ.,* 814 F.Supp. 1507, 1510–11 (D.Colo.1993); *Favia v. Indiana Univ. of Pa.,* 812 F.Supp. 578, 584–85 (W.D.Pa.1993), have adopted this formulation and ruled that a university violates Title IX if it ineffectively accommodates student interests and abilities regardless of its performance in other Title IX areas.

▆ Equal opportunity to participate lies at the core of Title IX's purpose. Because the third compliance area delineates this heartland, we agree with the district courts that have so ruled and hold that, with regard to the effective accommodation of students' interests and abilities, an institution can violate Title IX even if it meets the "financial assistance" and "athletic equivalence" standards. In other words, an institution that offers women a smaller number of athletic opportunities than the statute requires may not rectify that violation simply by lavishing more resources on those women or achieving equivalence in other respects.[12]

3. *Measuring Effective Accommodation.* The parties agree that the third compliance area is the field on which this appeal must be fought. In surveying the dimensions of this battleground, that is, whether an athletic program effectively accommodates students' interests and abilities, the Policy Interpretation maps a trinitarian model under which the university must meet at least one of three benchmarks:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed.Reg. at 71,418. The first benchmark furnishes a safe harbor for those institutions that have distributed athletic opportunities in numbers "substantially proportionate" to the gender composition of their student bodies. Thus, a university which does not wish to engage in extensive

**11.** The Manual divides Title IX coverage into the same three areas and notes that "an investigation may be limited to less than all three of these major areas." Manual at 7.

**12.** In any event, both the financial assistance and athletic equivalence standards are inapposite for present purposes. As to the former, Brown does not confer athletic scholarships and the plaintiffs do not allege that Brown has discriminated by gender in distributing other financial aid. As to the latter, the district court made only preliminary findings, *see Cohen,* 809 F.Supp. at 994–97, on the explicit understanding that it would revisit compliance *vel non* with the athletic equivalence standard at trial. *Id.* at 997.

compliance analysis may stay on the sunny side of Title IX simply by maintaining gender parity between its student body and its athletic lineup.

The second and third parts of the accommodation test recognize that there are circumstances under which, as a practical matter, something short of this proportionality is a satisfactory proxy for gender balance. For example, so long as a university is continually expanding athletic opportunities in an ongoing effort to meet the needs of the underrepresented gender, and persists in this approach as interest and ability levels in its student body and secondary feeder schools rise, benchmark two is satisfied and Title IX does not require that the university leap to complete gender parity in a single bound. Or, if a school has a student body in which one sex is demonstrably less interested in athletics, Title IX does not require that the school create teams for, or rain money upon, otherwise disinterested students; rather, the third benchmark is satisfied if the underrepresented sex's discernible interests are fully and effectively accommodated.[13]

It seems unlikely, even in this day and age, that the athletic establishments of many coeducational universities reflect the gender balance of their student bodies.[14] Similarly, the recent boom in Title IX suits suggests that, in an era of fiscal austerity, few universities are prone to expand athletic opportunities. It is not surprising, then, that schools more often than not attempt to manage the rigors of Title IX by satisfying the interests and abilities of the underrepresented gender, that is, by meeting the third benchmark of the accommodation test. Yet, this benchmark sets a high standard: it demands not merely some accommodation, but full and effective accommodation. If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test.

■ Although the full-and-effective-accommodation standard is high, it is not absolute. Even when male athletic opportunities outnumber female athletic opportunities, and the university has not met the first benchmark (substantial statistical proportionality) or the second benchmark (continuing program expansion) of the accommodation test, the mere fact that there are some female students interested in a sport does not *ipso facto* require the school to provide a varsity team in order to comply with the third benchmark. Rather, the institution can satisfy the third benchmark by ensuring participatory opportunities at the intercollegiate level when, and to the extent that, there is "sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team...." 44 Fed.Reg. at 71,418. Staying on top of the problem is not sport for the short-winded: the institution must remain vigilant, "upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex," *id.*, until the opportunities for, and levels of, competition are equivalent by gender.[15]

---

**13.** OCR also lists a series of illustrative justifications for the disparate treatment of men's and women's athletic teams, including (1) sports that require more resources because of the nature of the game (*e.g.,* contact sports generally require more equipment), (2) special circumstances, such as an influx of first-year players, that may require an extraordinary infusion of resources, (3) special operational expenses (*e.g.,* crowd control at a basketball tournament), as long as special operational expense needs are met for both genders and (4) affirmative measures to remedy past limitations on athletic opportunities for one gender. 44 Fed.Reg. at 71,-415–16.

**14.** Success in this regard is, however, attainable. After Washington State University was ordered to increase participation opportunities for women to a level equivalent with the percentage of female undergraduates, *see Blair v. Washington State Univ.,* 108 Wash.2d 558, 740 P.2d 1379 (1987), the University experienced considerable success in meeting court-ordered goals. *See* Mary Jordan, *Only One School Meets Gender Equity Goal,* Wash. Post, June 21, 1992, at D1.

**15.** If in the course of adding and upgrading teams, a university attains gender parity between its athletic program and its student body, it meets the first benchmark of the accommodation test. But, Title IX does not require that a

Brown argues that DED's Policy Interpretation, construed as we have just outlined, goes so far afield that it countervails the enabling legislation. Brown suggests that, to the extent students' interests in athletics are disproportionate by gender, colleges should be allowed to meet those interests incompletely as long as the school's response is in direct proportion to the comparative levels of interest. Put bluntly, Brown reads the "full" out of the duty to accommodate "fully and effectively." It argues instead that an institution satisfactorily accommodates female athletes if it allocates athletic opportunities to women *in accordance with the ratio of interested and able women to interested and able men,* regardless of the number of unserved women or the percentage of the student body that they comprise.

Because this is mountainous terrain, an example may serve to clarify the distinction between Brown's proposal and our understanding of the law. Suppose a university (Oooh U.) has a student body consisting of 1,000 men and 1,000 women, a one to one ratio. If 500 men and 250 women are able and interested athletes, the ratio of interested men to interested women is two to one. Brown takes the position that both the actual gender composition of the student body and whether there is unmet interest among the underrepresented gender are irrelevant; in order to satisfy the third benchmark, Oooh U. must only provide athletic opportunities in line with the two to one interested athlete ratio, say, 100 slots for men and 50 slots for women. Under this view, the interest of 200 women would be unmet—but there would be no Title IX violation.

■ We think that Brown's perception of the Title IX universe is myopic. The fact that the overrepresented gender is less than fully accommodated will not, in and of

itself, excuse a shortfall in the provision of opportunities for the underrepresented gender. Rather, the law requires that, in the absence of continuing program expansion (benchmark two), schools either meet benchmark one by providing athletic opportunities in proportion to the gender composition of the student body (in Oooh U.'s case, a roughly equal number of slots for men and women, as the student body is equally divided), or meet benchmark three by fully accommodating interested athletes among the underrepresented sex (providing, at Oooh U., 250 slots for women).[16]

In the final analysis, Brown's view is wrong on two scores. It is wrong as a matter of law, for DED's Policy Interpretation, which requires full accommodation of the underrepresented gender, draws its essence from the statute. Whether Brown's concept might be thought more attractive, or whether we, if writing on a pristine page, would craft the regulation in a manner different than the agency, are not very important considerations. Because the agency's rendition stands upon a plausible, if not inevitable, reading of Title IX, we are obligated to enforce the regulation according to its tenor. *See Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11 (holding that a "court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold [it]") (collecting cases); *Massachusetts v. Secretary of Agric.,* 984 F.2d 514, 522 (1st Cir.1993) (similar).

Brown's reading of Title IX is legally flawed for yet another reason. It proceeds from the premise that the agency's third benchmark countervails Title IX. But, this particular imprecation of the third benchmark overlooks the accommodation test's general purpose: to determine whether a student has been "excluded from partic-

---

school pour ever-increasing sums into its athletic establishment. If a university prefers to take another route, it can also bring itself into compliance with the first benchmark of the accommodation test by subtraction and downgrading, that is, by reducing opportunities for the overrepresented gender while keeping opportunities stable for the underrepresented gender (or reducing them to a much lesser extent).

16. Of course, if Oooh U. takes the benchmark three route, it will also have to provide at least the same number of slots for men; but, so long as women remain the underrepresented gender and their interests are fully accommodated, the university can provide as many (or as few) additional slots for men as it sees fit.

ipation in, [or] denied the benefits of" an athletic program "on the basis of sex...." 20 U.S.C. § 1681(a). While any single element of this tripartite test, in isolation, might not achieve the goal set by the statute, the test as a whole is reasonably constructed to implement the statute. No more is exigible. *See Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985).

As it happens, Brown's view is also poor policy for, in the long run, a rule such as Brown advances would likely make it more difficult for colleges to ensure that they have complied with Title IX. Given that the survey of interests and abilities would begin under circumstances where men's athletic teams have a considerable head start, such a rule would almost certainly blunt the exhortation that schools should "take into account the nationally increasing levels of women's interests and abilities" and avoid "disadvantag[ing] members of an underrepresented sex...." 44 Fed.Reg. at 71,417.

Brown's proposal would also aggravate the quantification problems that are inevitably bound up with Title IX. Student plaintiffs, who carry the burden of proof on this issue, as well as universities monitoring self-compliance, would be required to assess the level of interest in both the male and female student populations and determine comparatively how completely the university was serving the interests of each sex. By contrast, as we read the accommodation test's third benchmark, it requires a relatively simple assessment of whether there is unmet need in the underrepresented gender that rises to a level sufficient to warrant a new team or the upgrading of an existing team. We think the simpler reading is far more serviceable.

Furthermore, by moving away from OCR's third benchmark, which focuses on the levels of interest and ability extant in the student body, Brown's theory invites thorny questions as to the appropriate survey population, whether from the university, typical feeder schools, or the regional community. In that way, Brown's proposal would do little more than overcomplicate an already complex equation.

We will not paint the lily. Brown's approach cannot withstand scrutiny on either legal or policy grounds. We conclude that DED's Policy Interpretation means exactly what it says. This plain meaning is a proper, permissible rendition of the statute.

## IV. THE CONSTITUTIONAL CHALLENGE

We turn now to a series of case-specific issues, starting with Brown's constitutional challenge to the statutory scheme.

### A. *Equal Protection.*

Brown asseverates that if the third part of the accommodation test is read as OCR wrote it—to require full and effective accommodation of the underrepresented gender—the test violates the Fifth Amendment's Equal Protection Clause. We think not.

Brown assumes that full and effective accommodation disadvantages male athletes.[17] While it might well be that more men than women at Brown are currently interested in sports, Brown points to no evidence in the record that men are any more likely to engage in athletics than women, absent socialization and disparate opportunities. In the absence of any proof supporting Brown's claim, and in view of congressional and administrative urging that women, given the opportunity, will naturally participate in athletics in numbers equal to men, we do not find that the regulation, when read in the common-sense manner that its language suggests, *see supra* Part III(C)(3), offends the Fifth Amendment.

---

**17.** In characterizing Title IX as benefitting *only* women, Brown takes a rather isthmian view of the world at large. After all, colleges that have converted from exclusively female enrollment to coeducational enrollment face situations inverse to Brown's. In such a setting, the men's athletic program may well be underdeveloped, or underfunded, or both, while fiscal retrenchment offers no reprieve. Under these circumstances, Title IX would protect the athletic interests of men as the underrepresented sex.

What is more, even if we were to assume, for argument's sake, that the regulation creates a gender classification slanted somewhat in favor of women, we would find no constitutional infirmity. It is clear that Congress has broad powers under the Fifth Amendment to remedy past discrimination. *See, e.g., Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 565–66, 110 S.Ct. 2997, 3009, 111 L.Ed.2d 445 (1990) (noting that Congress need not make specific findings of discrimination to grant race-conscious relief); *Califano v. Webster,* 430 U.S. 313, 317, 97 S.Ct. 1192, 1195, 51 L.Ed.2d 360 (1977) (upholding social security wage law that benefitted women in part because its purpose was "the permissible one of redressing our society's longstanding disparate treatment of women"). Despite the little legislative history regarding discrimination in collegiate athletics that emerged during the consideration of Title IX, Congress did hold "extensive hearings on higher education" when Title IX was pending, in the course of which "much testimony was heard with respect to discrimination against women in our institutions of higher education." H.R.Rep. No. 554, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 2462, 2511. Athletics featured even more prominently in Congress's decision to reverse the *Grove City* rule. *See supra* p. 894. Under these circumstances, we find Brown's plaint unbecoming.

### B. *Affirmative Action.*

Brown rehashes its equal protection argument and serves it up as a nominally different dish, arguing that the district court's preliminary injunction constitutes "affirmative action" and violates the Equal Protection Clause because the court lacked a necessary factual predicate to warrant

such a step.[18] It is, however, established beyond peradventure that, where no contrary legislative directive appears, the federal judiciary possesses the power to grant *any* appropriate relief on a cause of action appropriately brought pursuant to a federal statute.[19] *See Franklin,* —— U.S. at ——, 112 S.Ct. at 1035 (upholding damage remedy for Title IX violation and noting that prospective relief would be inadequate); *see also* Fed.R.Civ.P. 54(c). Hence, this initiative, too, is bootless.

### V. BURDEN OF PROOF

In addition to its constitutional challenges, Brown questions the district court's allocation of the burden of proof. It suggests that the analytic model of burden setting and shifting commonly accepted in Title VII and ADEA cases, *see, e.g., Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Mesnick v. General Elec. Co.,* 950 F.2d 816, 823 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992), is ripe for importation into the precincts patrolled by Title IX. We reject the suggestion.

In our view, there is no need to search for analogies where, as in the Title IX milieu, the controlling statutes and regulations are clear. To invoke the prophylaxis of Title IX, the statute, 20 U.S.C. § 1681(b), and the regulations, read together, require a Title IX plaintiff to show disparity between the gender composition of the institution's student body and its athletic program, thereby proving that there is an underrepresented gender. Then, the plaintiff must show that a second element—unmet interest—is present. In

---

**18.** The "authority" that Brown cites in support of this proposition, *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978) (Powell, J. concurring), in fact suggests the propriety of affirmative relief where there are judicial findings of a statutory violation. *See id.*

**19.** On this point, Brown cannot win even if its basic theories have merit. If the district court

did not engage in the proper factfinding, then its order constitutes an abuse of its discretion. If, on the other hand, Title IX does not provide for equitable relief, the district court will have erred as a matter of law in choosing a remedy outside the statutory margins. In either event, given that the statute itself is compatible with the Equal Protection Clause, Brown cannot prevail *on its constitutional claim.*

other words, the plaintiff must prove that the underrepresented gender has not been "fully and effectively accommodated by the present program." 44 Fed.Reg. at 71,418. If the plaintiff carries the devoir of persuasion on these two elements, she has proven her case unless the university shows, as an affirmative defense, "a history and continuing practice of program expansion which is demonstrably responsive to the developing interests and abilities of the members" of the underrepresented gender. *Id.*

Over and beyond the express dictates of the applicable statute and regulations, there is another valid reason for eschewing the Title VII paradigm in most Title IX cases. The scope and purpose of Title IX, which merely conditions government grants to educational institutions, are substantially different from those of Title VII, which sets basic employment standards. *See Franklin v. Gwinnett County Pub. Sch.*, 911 F.2d 617, 622 (11th Cir.1990) (declining to apply Title VII analysis to Title IX litigation), *aff'd,* —— U.S. ——, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Title IX, while it applies only to schools that receive federal funds, influences almost all aspects of educational management. In contrast, Title VII applies to a much wider range of institutions—virtually all employers—but targets only employment-related matters. Moreover, Title IX is largely aspirational—on the whole, affected institutions choose how to accomplish the statutory goal—whereas Title VII is largely peremptory—covered employers must adhere to statutorily prescribed standards. Thus, the former is a loosely laced buskin, inhospitable to the specialized choreography of presumption and production upon which the *Burdine/McDonnell Douglas* burden-shifting framework depends.

We conclude, therefore, that excepting perhaps in the employment discrimination context, *see Lipsett v. University of P.R.,* 864 F.2d 881, 897 (1st Cir.1988) (applying Title VII standards in Title IX case, but explicitly limiting the crossover to the employment context), the Title VII burden-of-proof rules do not apply in Title IX cases.[20] Consequently, a Title IX plaintiff makes out an athletic discrimination case by proving numerical disparity, coupled with unmet interest, each by a fair preponderance of the credible evidence, so long as the defendant does not rebut the plaintiff's showing by adducing preponderant history-and-practice evidence.

## VI. THE PRELIMINARY INJUNCTION

We come at long last to the cynosure of the appeal. This is familiar territory. A district court, faced with a motion for preliminary injunction, must assess the request in four particular ways, evaluating (1) the movant's probability of victory on the merits; (2) the potential for irreparable harm if the injunction is refused; (3) the balance of interests as between the parties, *i.e.,* whether the harm to the movant if the injunction is withheld outweighs the harm to the nonmovant if the injunction is granted; and (4) the public interest. *See Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991); *Aoude v. Mobil Oil Corp.,* 862 F.2d 890, 892 (1st Cir.1988); *Hypertherm, Inc. v. Precision Prods., Inc.,* 832 F.2d 697, 699 & n. 2 (1st Cir.1987). Of course, a district court's conclusions at the preliminary injunction stage are only attempts to predict probable outcomes. Thus, "a party losing the battle on likelihood of success may nonetheless win the war at a succeeding trial...." *Guilbert,* 934 F.2d at 6.

If, in conducting this tamisage, the district court has made no clear error of law or fact, we will overturn its calibration of the four factors only for a manifest abuse of discretion. *See Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir.1993); *Guilbert,* 934 F.2d at 5.

Here, the district court found that the quadrat of factors favored plaintiffs' position. *See Cohen,* 809 F.Supp. at 985–1001. Brown disagrees with these findings up and down the line, but offers developed

**20.** *But cf. Cook v. Colgate Univ.,* 802 F.Supp. 737, 743 (N.D.N.Y.1992) (applying Title VII process to Title IX case at urging of parties). *Cook* is presently on appeal to the Second Circuit. *See supra* note 4.

argumentation only as to three of the four components. Because Brown does not explain its challenge to the district court's finding that the public interest would be disserved by leaving the two women's teams on the sidelines until the suit is finally resolved, we ignore its *pro forma* protest in that respect. Litigants cannot preserve an issue for appeal simply by raising a pennant and then moving on to another subject. *See United States v. Slade,* 980 F.2d 27, 30–31 & n. 3 (1st Cir.1992) (reiterating that theories not briefed or argued on appeal are waived); *Ryan v. Royal Ins. Co.,* 916 F.2d 731, 734 (1st Cir.1990) (stating that "issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned"). Accordingly, we limit our review to the three factors briefed and argued.

### A. *Likelihood of Success.*

It is old hat, but still very much in fashion, that a movant's likelihood of success at trial is particularly influential in the preliminary injunction calculus. *See Weaver,* 984 F.2d at 12; *Guilbert,* 934 F.2d at 6; *Public Serv. Co. v. Town of West Newbury,* 835 F.2d 380, 383 (1st Cir.1987). In this case, the district court paid meticulous attention to the parties' prospects for success over the long haul. The court plainly visualized both the factual intricacies and legal complexities that characterize Title IX litigation. It held a lengthy adversary hearing and reviewed voluminous written submissions. And at journey's end, it correctly focused on the three-part accommodation test.

The court faultlessly dispatched the first two elements of the test. With respect to the comparison between Brown's athletic agenda and student body, we adopt the lower court's record-rooted finding that the University did not meet—or even closely approach—the "substantial proportionality" threshold because it offered too few varsity opportunities for women. *See Cohen,* 809 F.Supp. at 991. Cognizant, perhaps, that the raw numbers tell an unambiguous tale, Brown does not challenge the inviolability of this finding.

As to the test's second part, the court below found that, although Brown could point to "impressive growth" in its women's athletic program in the 1970s, the school had not continued filling the gap during the next two decades. *Id.* On this basis, the court concluded that Brown had not met the benchmark. *See id.* Brown asserts that the district court erred by not crediting it sufficiently for its dramatic expansion of women's sports in the 1970s, and we are not entirely unsympathetic to this plea. In the last analysis, however, this was a judgment call and the trial court's judgment was not unreasonable. While a university deserves appreciable applause for supercharging a low-voltage athletic program in one burst rather than powering it up over a longer period, such an energization, once undertaken, does not forever hold the institution harmless. Here, Brown labored for six years to weave a broad array of new activities into the fabric of its palestrian offerings. The district court apparently believed, however, that Brown then rested on its laurels for at least twice that long. The very length of this hiatus suggests something far short of a *continuing* practice of program expansion. And, moreover, a university must design expansion in whatever form and at whatever pace to respond to the flux and reflux of unserved interests. The court below found that Brown failed in this task. *See id.* The issue of responsiveness is fact-intensive and in most instances, as here, its resolution will be within the trier's province. We find no error, therefore, in the district court's resolution of the second aspect of the accommodation test.

The third benchmark presents a more problematic scenario. The district court incorrectly held that Brown bore the burden of showing that it had fully and effectively accommodated the interests and abilities of its women athletes. *See id.* at 997. Section 1681(b) requires that the plaintiffs, rather than the University, prove a shortfall in the full and effective accommodation of interested female athletes by showing, initially, both numerical disparity

and unmet interest. *See supra* Part V. Nonetheless, we do not think that the court's bevue is fatal. Even when a trial court has misconstrued the law, an appellate tribunal may avoid remanding if the record is sufficiently developed and the facts necessary to shape the proper legal matrix are sufficiently clear. *See, e.g., Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 642 (1st Cir. 1992) (coupling district court's factual findings with correct rule of law); *United States v. Mora,* 821 F.2d 860, 869 (1st Cir. 1987) (same); *see also Cameron v. Tomes,* 990 F.2d 14, 20 (1st Cir.1993) (using findings of fact made in the framework of an unacceptable legal analysis to affirm injunctive relief on a different legal theory).

■ We find this to be a particularly auspicious setting in which to employ such a device. Although the full and effective accommodation of athletic interests is likely to be a complicated issue where allegedly underrepresented plaintiffs sue to force a university to create a neoteric team or upgrade the status of a club team, *see, e.g., Cook,* 802 F.Supp. at 737, there is unlikely to be any comparably turbid question as to interest and ability where, as here, plaintiffs are seeking merely to forestall the interment of healthy varsity teams.

In this instance, the district court's subsidiary findings of fact render it beyond cavil that the plaintiffs carried their burden of proof. The court found, for example, that there was "great interest and talent" amongst Brown's female undergraduates which, following the cuts, would go unserved. *Cohen,* 809 F.Supp. at 992. Of particular moment, the court also found the interest and talent on campus ample to support women's varsity volleyball and gymnastics teams, *see id.*—a finding that is hardly surprising in view of the teams' robust health before the budget-cutters arrived on the scene. The court proceeded to note that, while club teams can be equivalent to intercollegiate teams when they regularly participate in varsity competition, *see* 44 Fed.Reg. at 71,413 n. 1, the teams that Brown downgraded would not regularly be competing against varsity teams and would suffer a diminution of status in a wide range of other significant respects. *See Cohen,* 809 F.Supp. at 992–93.

The potency of this evidence is an effective antidote to the district court's partial misapplication of the burden of proof. Because the record contains nothing that would allow a trier to find that Brown's athletic agenda reflects the makeup of its student body or that the plaintiff class is so poorly populated as to warrant a reduction in women's sports,[21] the court's error was harmless. In a nutshell, the plaintiffs met their challenge on parts one and three of the accommodation test. This conclusion, in partnership with the district court's supportable finding that Brown did not satisfactorily demonstrate a continuing expansion of its women's athletic lineup, strikes the gold. The court's prediction of plaintiffs' probable success was, therefore, adequately grounded.

### B. *Irreparable Injury.*

■ The next area of inquiry is irreparable harm. The district court heard from a variety of athletic administration experts. The court concluded that, absent judicial intervention, the plaintiffs would suffer irremediable injury in at least three respects: competitive posture, recruitment, and loss of coaching. As club teams, the district court thought women's volleyball and gymnastics would increasingly become less competitive, have fewer players, be unable to schedule varsity teams from other schools, become unattractive to potential stars making college choices, and suffer stagnation in the growth of individual talent due to the absence of coaching.[22] *See*

---

**21.** It bears mentioning in this regard that Judge Pettine heard, and apparently credited, evidence indicating that there were other women's club teams sufficiently accomplished and populated to flourish as varsity squads. *Cohen,* 809 F.Supp. at 992.

**22.** Brown does not retain coaches for its club teams and few of the teams have the independent financial wherewithal to hire coaches. Here, the district court specifically found that if the gymnastics team was downgraded to club status, it would likely lose its paid coach when

*Cohen*, 809 F.Supp. at 992–93. Certainly, these harms exist to some degree. In highly nuanced cases involving a melange of competing considerations, the aggregate injury, and whether or not it is irreparable, come primarily within the trial court's ken. *See K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989) (acknowledging that "[d]istrict courts have broad discretion to evaluate the irreparability of alleged harm") (citation omitted). So it is here. Although the types of harms the court catalogued might not all rise to the same level of seriousness, the overall record supports, even though it does not compel, the court's assessment of their cumulative severity. Given, especially, the lack of any other concinnous remedy *pendente lite*, we will not second-guess the district court's finding of irreparable injury.

### C. *The Balance of Harms.*

 Finally, the district court found that the competing equities weighed in favor of granting the injunction. After hearing testimony from Brown's Financial Vice–President and its Associate Athletic Director, the district court concluded that the cost of the interim injunction would be relatively slight; and that, in view of discretionary funds already contained in the Athletic Department budget and a presidential "contingency fund," Brown possessed the wherewithal to defray the costs without undue hardship. *See Cohen*, 809 F.Supp. at 1000–01. By contrast, the court noted the volleyball and gymnastics programs' *continuing* deterioration in the aftermath of the demotion. *See id.* at 992–93. On balance, the court determined that the financial burden on Brown was tolerable, and, in any event, was overbalanced by the potential harm to the plaintiff class if the court took no action.

Brown contests the results of this balancing on the premise that the district court wrongly discounted the testimony of one of its witnesses and did not adequately consider the possibility that false hopes might be raised by a preliminary injunction. It is, however, axiomatic that a district court, sitting without a jury, may selectively discount testimony as it weighs conflicting viewpoints and adjudicates the facts. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984); *Anthony v. Sundlun*, 952 F.2d 603, 606 (1st Cir.1991). This is a trial court's prerogative and, indeed, its duty.

It is similarly fundamental that a preliminary injunction, by its very nature, is sometimes ephemeral. Hence, the risk that some observers might read into a temporary restrainer more than it eventually proves to mean is endemic to the equitable device and cannot tip the scales against its use in any particular circumstance. It defies elemental logic to say that parties who the court has determined will probably succeed at trial should be denied the interim relief to which they are entitled because their ultimate victory is less than absolutely certain.

In fine, the district court did not overspill its discretion either in taking Brown's self-interested description of its financial plight with a grain of salt or in limiting the role that raising false hopes might play in the equitable calculus.

### D. *Summing Up.*

We summarize succinctly, beginning with the probability of plaintiffs' success. In an era where the practices of higher education must adjust to stunted revenues, careening costs, and changing demographics, colleges might well be obliged to curb spending on programs, like athletics, that do not lie at the epicenter of their institutional mission. Title IX does not purport to override financial necessity. Yet, the pruning of athletic budgets cannot take place solely in comptrollers' offices, isolated from the legislative and regulatory imperatives that Title IX imposes.

This case aptly illustrates the point. Brown earnestly professes that it has done no more than slash women's and men's athletics by approximately the same degree, and, indeed, the raw numbers lend

---

her contract expired in June of 1993. *Cohen,* 809 F.Supp. at 992.

partial credence to that characterization.[23] But, Brown's claim overlooks the shortcomings that plagued its program before it took blade in hand. If a school, like Brown, eschews the first two benchmarks of the accommodation test, electing to stray from substantial proportionality and failing to march uninterruptedly in the direction of equal athletic opportunity, it must comply with the third benchmark. To do so, the school must fully and effectively accommodate the underrepresented gender's interests and abilities, even if that requires it to give the underrepresented gender (in this case, women) what amounts to a larger slice of a shrinking athletic-opportunity pie.

The record reveals that the court below paid heed to these realities. It properly recognized that even balanced use of the budget-paring knife runs afoul of Title IX where, as here, the fruits of a university's athletic program remain ill-distributed after the trimming takes place. Because the district court understood this principle, and because its findings of fact as to the case's probable outcome are based on substantial evidence, the court's determination that plaintiffs are likely to succeed on the merits is inexpugnable.

The district court displayed similar dexterity in touching the other three bases en route to a grant of injunctive relief: irreparability of injury, the relative weight of potential harms, and impact on the public interest. The court found that the harm to the plaintiff class was irremediable, absent prompt injunctive relief; that the balance of harms favored such relief; and that the overriding public interest lay in the firm enforcement of Title IX. In each of these areas, as in the likelihood-of-success arena, the court made serial findings that, taken at face value, amply justify injunctive relief. Because these findings derive adequate support from the record, the court's decree must stand as long as the specific relief the court ordered was appropriate. It is to this issue that we now turn.

## VII. REMEDIATION

After applying the preliminary injunction standard, the district court ordered relief *pendente lite*, temporarily reinstating the women's volleyball and gymnastics teams. Brown argues that such specific relief is inappropriate because it intrudes on Brown's discretion. The point has some cogency. We are a society that cherishes academic freedom and recognizes that universities deserve great leeway in their operations. *See, e.g., Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 795 (1st Cir. 1992), *petition for cert. filed* (Feb. 3, 1993); *Lamphere v. Brown Univ.,* 875 F.2d 916, 922 (1st Cir.1989). In addition, Title IX does not require institutions to fund any particular number or type of athletic opportunities—only that they provide those opportunities in a nondiscriminatory fashion if they wish to receive federal funds.

Nonetheless, the district court has broad discretionary power to take provisional steps restoring the status quo pending the conclusion of a trial. *See Ricci v. Okin,* 978 F.2d 764, 767 (1st Cir.1992); *Guilbert,* 934 F.2d at 7 & n. 3. Considering the district court's proper estimation and deft application of the preliminary injunction standard, *see supra* Part VI, we think that requiring Brown to maintain the women's volleyball and gymnastics teams in varsity status for the time being is a remedial choice within the district court's discretion. That is not to say, however, that the same remedy will be suitable at trial's end if the Title IX charges prove out against Brown. The district court has noted, we believe appropriately, that if it ultimately finds Brown's athletic program to violate Title IX, it will initially require the University to propose a compliance plan rather than mandate the creation or deletion of particular athletic teams. *Cohen,* 809 F.Supp. at 1001. Although the district

---

**23.** We note, however, that while the cuts proposed by Brown eliminate a roughly equal number of athletic opportunities for women as for men, those cuts subtract roughly four times more money from the budget for female pancratiasts than from the budget for their male counterparts. *See supra* pp. 892–93. And, as a noted playwright once observed, "where there is no money, there is no change of any kind." Moss Hart, *Act One* (1959).

**907**

court has the power to order specific relief if the institution wishes to continue receiving federal funds, *see Franklin,* —— U.S. at ——, 112 S.Ct. at 1035, the many routes to Title IX compliance make specific relief most useful in situations where the institution, after a judicial determination of non-compliance, demonstrates an unwillingness or inability to exercise its discretion in a way that brings it into compliance with Title IX.

## VIII. CONCLUSION

We need go no further. This litigation presents an array of complicated and important issues at a crossroads of the law that few courts have explored. The beacon by which we must steer is Congress's unmistakably clear mandate that educational institutions not use federal monies to perpetuate gender-based discrimination. At the same time, we must remain sensitive to the fact that suits of this genre implicate the discretion of universities to pursue their missions free from governmental interference and, in the bargain, to deploy increasingly scarce resources in the most advantageous way. These considerations, each of which is in service to desirable ends, are necessarily in tension in Title IX cases. Thus, there are unlikely to be ideal solutions to all the vexing problems that might potentially arise.

This appeal exemplifies many of the difficulties inherent in Title IX litigation. We do not presume to say that the district court's interim solution is perfect, but it is fair and it is lawful. On the record compiled to date, the preliminary injunction requiring Brown to reinstate its women's volleyball and gymnastics teams for the time being came well within the encincture of judicial discretion. We will not meddle.

*The preliminary injunction is affirmed, the temporary stay is dissolved, and the cause is remanded to the district court for further proceedings. Costs to appellees.*