**William M. KELLEY, et al., Plaintiffs,**

v.

**BOARD OF TRUSTEES OF the UNIVERSITY OF ILLINOIS, et al., Defendants.**

No. 93–1327.

United States District Court, C.D. Illinois, Peoria Division.

Sept. 1, 1993.

John H. Otto, Zimmerly Gadau Selin & Otto, Champaign, IL, for plaintiffs.

James C. Kearns, Fred K. Heinrich, Heyl Royster Voelker & Allen, Urbana, IL, for defendants.

## ORDER [1]

McDADE, District Judge.

Before the Court is Plaintiffs' Motion for a Preliminary Injunction (docket # 10); the Defendants' Motion to Dismiss (docket # 6) and the Defendants' Motion for a Protective Order (docket # 15). Pursuant to Rule 12(b)(6), the parties have stipulated that the Motion to Dismiss must be converted into a Rule 56 Motion for Summary Judgment because it presents matters outside the pleadings.

 Federal Rule 56(c) Summary Judgment is appropriate when there remains no genuine issue of material fact upon which a reasonable jury (or trier of fact) could find in favor of the non-moving party, and the moving party is entitled to judgment as a matter of law. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or

---

1. This Order is a supplement to the Order entered on August 26, 1993, at the close of arguments and testimony concerning the summary judgment motion and includes citations not previously included. This Order also includes certain minor additions to or deletions from the oral Order.

defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–27, 106 S.Ct. 2548, 2552–55, 91 L.Ed.2d 265 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file, to show that a rational jury (or trier of fact) could return a verdict in this party's favor. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–27, 106 S.Ct. 2548, 2552–55, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254–55, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Consequently, the inquiry on summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury, or whether the evidence is so one-sided that one party must prevail as a matter of law. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12. Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker,* 957 F.2d 506, 507–08 (7th Cir.1992). A metaphysical doubt will not suffice. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Nonetheless, the Court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10. *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir.1992). After reviewing the parties' briefs and hearing oral arguments and testimony on the motions, the Court has made the following findings of fact and conclusions of law. They are not meant to be exhaustive.

### FACTS

The undisputed facts are as follows. The Court has jurisdiction in this matter pursuant to Title 28 U.S.C. § 1331; Title 28 U.S.C. § 1343(a)(3); Title 20 U.S.C. § 1681(a); Title 42 U.S.C. § 1983; and the Fourteenth Amendment to the United States Constitution. Plaintiffs allege that Defendants dis-criminated against them on the basis of sex by cutting the men's swimming team, but not the women's swimming team, in violation of Title IX, 20 U.S.C. § 1681. Plaintiffs also allege that the University's action violated the equal protection clause of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983, and 42 U.S.C. § 1985(3).

Plaintiffs are males and members of the men's swimming team at the University of Illinois. Plaintiffs Kelley, Mulloy, and Thompson will be seniors in the 1993–94 academic year; Plaintiff Sims will be a junior in the 1993–94 academic year; and Plaintiffs Rossi, Juiris, Gramm and Gargar will be sophomores in the 1993–94 academic year.

Defendant Board of Trustees of the University of Illinois is a subdivision of the State of Illinois which operates an educational program receiving federal financial assistance at its Urbana–Champaign campus. Defendant Mortin W. Weir is Chancellor of the University of Illinois' Urbana–Champaign campus and acted in his individual capacity under color of law during the occurrences complained of herein.[2] Defendant Ronald E. Guenther is Director of Intercollegiate Athletics at the University of Illinois' Urbana–Champaign campus and acted in his individual capacity under color of law during the occurrences complained of herein. Defendant Karol Kahrs is Associate Athletic Director and Director of Women's Athletics at the University of Illinois' Urbana–Champaign campus and acted in her individual capacity under color of state law during the occurrences complained of herein.

The University of Illinois has had varsity men's swimming teams since 1911, and in the 1992–93 academic year 11 scholarships were awarded among 28 male swimming team members. The University of Illinois has had varsity women's swimming teams since at least 1982, and in the 1992–93 academic year 14 scholarships were awarded among 18 female swimming team members.

The men's varsity swimming season for the academic year 1993–94 was scheduled to be-

2. Mortin W. Weir retired from his position as Chancellor of the University of Illinois on August 20, 1993. *See* Deposition of Mortin Weir, Exhib-it 1 to Defendants' Motion for Summary Judgment.

gin in September 1993. On May 7, 1993, however, the University of Illinois announced that it intended to eliminate the varsity programs for men's swimming and fencing and men and women's diving, effective July 1, 1993. The announcement stated that "budget constraints" were the primary reason for the Athletic Board's decision. Nonetheless, the University indicated that it intended to honor the financial commitments to the student athletes on scholarship who were affected by the cuts.

The Court finds that financial and budgetary constraints were the primary considerations involved in the University's decision to eliminate the men's swimming team, but that other considerations, such as compliance with Title IX and the "gender equity" policy of the Big Ten Conference, also played a role. The University of Illinois is a member of the Big Ten Conference, a group of 11 universities who associate together for the purpose of competing in intercollegiate athletics. The Big Ten Conference promulgated what is referred to as a "gender equity" policy requiring member institutions to accept a percentage factor of 60 percent for men and 40 percent for women as the goal for male-female participation in varsity sports programs.

Affidavits submitted by Patricia Askew, Director of the Office of Admissions and Records, and Rick Allen, Director of Compliance for the Division of Intercollegiate Athletics at the University of Illinois at Urbana–Champaign, indicate that the following statistics represent the numerical composition of the undergraduate student population of men and women compared to the numerical composition of the men and women participating in intercollegiate sports during the last three academic years.[3]

### Year 1990–91

| | Total | Men | % | Women | % |
|-------|--------|--------|----------|--------|----------|
| UG: | 26,445 | 14,925 | (56.00%) | 11,520 | (44.00%) |
| Sports: | 558 | 421 | (75.45%) | 137 | (24.55%) |

### Year 1991–92

| | Total | Men | % | Women | % |
|-------|--------|--------|----------|--------|----------|
| UG: | 26,366 | 14,787 | (56.00%) | 11,579 | (44.00%) |
| Sports: | 550 | 413 | (75.09%) | 137 | (24.91%) |

### Year 1992–93

| | Total | Men | % | Women | % |
|-------|--------|--------|----------|--------|----------|
| UG: | 25,846 | 14,427 | (56.00%) | 11,419 | (44.00%) |
| Sports: | 474 | 363 | (76.58%) | 111 | (23.42%) |

These statistics show that during the past three school years student enrollment and total sports participation by men and women went down at the University of Illinois campus at Urbana–Champaign. Interesting enough, though, for the academic year 1992-93, men's participation went up by more than a percentage point to 76.58 percent, while women's participation went down by more than a percentage point to 23.42 percent.

## TITLE IX

In Count I, Plaintiffs present a legal question which has not been directly decided by

3. At the hearing, the parties stipulated to statistics which are slightly different than those presented in the affidavits. See Deposition of Mortin W. Weir, Exhibit 1, Defendants' Motion for Summary Judgment. Nonetheless, the disparities remain substantially the same for purposes of a decision in this case.

any court in this country to date. Although gender discrimination cases have been filed by female athletes against universities under Title IX, this is the first case known to the Court which has been brought against a university by men alleging gender discrimination in violation of Title IX.

■ Resolution of this question has been difficult. The difficulty arises because, in the context of athletics, the plain meaning of Title IX has been limited by the implementing regulations, the policy interpretation of those regulations and the case law interpreting each of these sources. *See Cohen v. Brown University*, 991 F.2d 888 (1st Cir. 1993); *Roberts v. Colorado State*, 998 F.2d 824 (10th Cir.1993); *Cook v. Colgate University*, 992 F.2d 17 (2d Cir.1993); *Favia v. Indiana University of Pennsylvania*, 812 F.Supp. 578 (W.D.Penn.1993); 34 C.F.R. § 106.41 (1993); 44 Fed.Reg. 71413–23 (1979). Quite frankly, these interpretations have converted Title IX from a statute which prohibits discrimination on the basis of sex (defined as the elimination of or exclusion from participation opportunities), into a statute which provides "equal opportunity for members of both sexes." [4]

■ "Equal opportunity," however, does not necessarily require "strict numerical equality between the gender balance of a college's athletic program and the gender balance of its student body." *Cohen v. Brown University*, 991 F.2d 888, 894 (1st Cir.1993). In fact, as interpreted and en-

forced by the regulations, the University may provide "equal opportunity" to members of each gender in one of three ways: (1) "the participation opportunities for male and female students are in substantially proportionate numbers to their respective enrollments;" (2) the "interests and abilities" of the sex which is underrepresented with respect to their undergraduate enrollment are "fully and effectively accommodated by the present program;" or (3) the underrepresented gender's interests and abilities will be accommodated by "expansion" of the athletic program. 44 Fed.Reg. at 71418.

■ Program expansion was not the objective in this case; rather, financial constraints motivated and required the University of Illinois to cut programs. Even if the University's decision were not based on financial or budgetary reasons, but made solely to move closer to substantial proportionality (that is, to increase participation opportunities for women to a level equivalent with the percentage of female undergraduate enrollees), the failure to cut women's programs would still be countenanced by Title IX. As stated by the First Circuit Court of Appeals in *Cohen v. Brown*, 991 F.2d 888, 898, footnote 15:

> If in the course of adding and upgrading teams, a university attains gender parity between its athletic program and its student body, it meets the first benchmark of the accommodation test. But, Title IX does not require that a school pour ever-increasing sums into its athletic establish-

---

4. In fact, Title IX flatly states:

**Section 1681. Sex**
**(a) Prohibition against discrimination**
No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance....
20 U.S.C. § 1681(a).
Although § 1681(b) clearly states that § 1681(a) does not require "preferential treatment" for the statistically underrepresented sex, the implementing regulations for Title IX, found at 35 CFR § 106.41, interpret § 1681(a)'s prohibition of exclusion on the basis of sex as a vehicle to provide "equal opportunity" to members of both sexes. The regulations provide in relevant part:

**§ 106.41. Athletics**
(a) *General.* No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.
\* \* \* \* \* \*
(c) *Equal Opportunity.* A recipient which operates or sponsors interscholastic or intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available, the Director will consider, among other factors:
(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes.

ment. If a university prefers to take another route, it can also bring itself into compliance with the first benchmark of the accommodation test by subtraction and downgrading, that is, by reducing opportunities for the overrepresented gender while keeping opportunities stable for the underrepresented gender (or reducing them to a much lesser extent).

■ Consequently, due to financial constraints and the need to comply with Title IX, the University chose to drop the men's swimming team without dropping the women's swimming team, because men's participation in athletics was more than substantially proportionate to their enrollment, but women's participation was not.[5]

Under Title IX, the University could cut men's programs without violating the statute because men's interests and abilities are presumptively met when substantial proportionality exists. Conversely, women's programs could not be cut because their level of participation was already disproportionate to their respective enrollment, and thus the University would be vulnerable to a finding of noncompliance with Title IX if the University failed to "fully and effectively accommodate [women's] interests and abilities."[6] *See* 44 Fed.Reg. at 71418.

In other words, according to the regulations and the case law, members of the men's swimming team have not been discriminated against under Title IX. Even though elimination of their program excluded them from varsity participation as individuals, the percentage of all men participating in the varsity program is more than "substantially proportionate" to the percentage of men represented by the undergraduate population. This status did not change following the cut. *Cohen v. Brown University*, 991 F.2d 888, 906 (1st Cir.1993); *Roberts v. Colorado State*, 998 F.2d 824 (10th Cir.1993); *Cook v. Colgate University*, 992 F.2d 17 (2d Cir.1993); *Favia*

*v. Indiana University of Pennsylvania*, 812 F.Supp. 578 (W.D.Penn.1993). *See also* 44 Fed.Reg. at 71418.

Although the law might be interpreted differently, the Court must give deference to regulations and interpretations promulgated under the authority of Congress and existing case law interpreting Title IX. *Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Accordingly, Plaintiffs' claim under Title IX fails, and Defendants are entitled to Summary Judgment in Count I.

## EQUAL PROTECTION

Plaintiffs also raise equal protection arguments in Counts II and III. Count II alleges that Defendants' decision to eliminate the men's swimming team, but not the women's team, created an illegal gender classification which denied Plaintiffs' equal protection of the law under the Fourteenth Amendment, in violation of 42 U.S.C. § 1983. Count III alleges a conspiracy in violation of 42 U.S.C. § 1985(3) in that Defendants, together with unnamed athletic directors and associate athletic directors, conspired to deny Plaintiffs' civil rights in violation of Title IX and the Fourteenth Amendment.

■ To state an equal protection claim, a plaintiff must allege in the pleadings that the government intentionally discriminated against plaintiff by classifying him or her for different treatment under the law than one similarly situated. *See* J. Nowak & R. Rotunda, Constitutional Law § 14.2 at 570 (4th ed. 1991). To violate the equal protection clause, the government must intentionally classify similarly situated individuals for different treatment on the basis of an impermissible characteristic, such as race, national origin, or gender.

---

5. The desire or concern of the University to comply with the "Gender Equity" Policy of the Big Ten Conference mandating an ultimate goal of 60/40 male/female percentage participation in athletics does not preempt compliance with Title IX requirements of equal opportunity for males and females. Accordingly, the University's actions must be measured by Title IX requirements.

6. Notably, the University may have violated Title IX by dropping the women's diving team, which defendants admit would have been a hard case to defend if the sole woman diver was a plaintiff in this case (at least that is how the Court interprets defense counsel's response).

■ Gender classifications are subject to an "intermediate" standard of scrutiny. To withstand constitutional challenge under this standard, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976), *rehearing denied,* 429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1977).

"In limited circumstances, a gender based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened." *Mississippi University for Women v. Hogen,* 458 U.S. 718, 728, 102 S.Ct. 3331, 3341, 73 L.Ed.2d 1090, 1100 (1982). These classifications establish what is commonly referred to as "reverse discrimination" and/or "affirmative action" for the purpose of remedying historical discrimination.

In cases where men have sued alleging gender discrimination under the Fourteenth Amendment, the Supreme Court has upheld these classifications when they serve a compensatory, remedial purpose of eradicating past discrimination against women, i.e., reversing the effects of laws which classified men for benefits under the law and women for burdens. *Mississippi University for Women v. Hogen,* 458 U.S. 718, 728, 102 S.Ct. 3331, 3341, 73 L.Ed.2d 1090, 1100 (1982), *citing, Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977). However, "the mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying the statutory scheme." *Hogen,* 458 U.S. at 728, 102 S.Ct. at 3338. State officials must actually prove that women "lacked opportunities." *Hogen,* 458 U.S.

at 729, 102 S.Ct. at 3338. Once this showing is made, the officials must then satisfy the second prong of the intermediate standard, establishing that the classification is "substantially related" to the achievement of the remedial purpose alleged.

■ Title IX, as interpreted by the Court, is designed to remedy gender discrimination against underrepresented athletes— either men or women.[7] In this case, the underrepresented athletes are women. Although the University's decision to eliminate the men's swimming team rather than the women's swimming team classifies men for different treatment than women on the basis of gender, this action was taken in compliance with Title IX. Compliance with Title IX serves a remedial purpose which qualifies as an important state interest which is substantially related to eradicating historical discrimination against women in athletics at the University of Illinois. Accordingly, the Court finds that the Defendants have not violated the equal protection clause of the Fourteenth Amendment. Therefore, Summary Judgment is granted on Count II in favor of Defendants.

Plaintiffs cannot prevail in Count III under § 1985(3) unless they can show an equal protection violation. For the reasons stated above, the Court also grants summary judgment in favor of Defendants on Count III.

### CONCLUSION

The Court is not unsympathetic to the plight of members on the men's swimming team and recognizes that Congress, in enacting Title IX, probably never anticipated that it would yield such draconian results. On the other hand, university athletic programs are designed, in their purest intent, to provide an education, coupled with equal access to athletic opportunities for men and women—a

7. Plaintiffs argue that "underrepresented gender" refers to the interest and ability level of either gender rather than disproportional representation among men or women. According to this theory, statistical disparities which merely reflect participation rates do not necessarily indicate that women's interests and abilities are underrepresented. Rather, Plaintiffs contend that without proof of unmet interests and abilities among women athletes, Defendants' decision to cut the men's swimming team made them an "underrepresented gender" for purposes of Title IX, by eliminating demonstrated interest and ability among men. Although this argument has logical appeal, it undermines the interplay between the "safe harbor" of "substantial proportionality" (i.e., numerical equality) and "accommodation" of the "underrepresented gender's interests and abilities," as alternative forms of compliance with Title IX. 44 Fed.Reg. at 71418.

244

desirable result which had not been achieved prior to Title IX.

Plaintiffs' case has emotional appeal because it graphically demonstrates the inherent unfairness of decisions which classify and isolate one gender for burdens that the other gender is not required to bear. Certainly it must be acknowledged that the members of the men's swimming team are innocent victims of Title IX's benevolent attempt to remedy the effects of an historical deemphasis on athletic opportunities for women. The Court sincerely sympathizes with the personal loss felt by members of the men's swimming team while recognizing the salutary effects of Title IX for women athletes. Women have paid and continue to pay for discriminatory actions and attitudes which have historically excluded them from the athletic opportunities given to men, as represented by current statistical disparities among athletes in universities and colleges across the country. These are the disparities Title IX, and this decision, seek to remedy.

Plaintiffs concede that not only does the University of Illinois have a right to cut programs, but also that the men's swimming team does not have a constitutional right to the continuation of the swimming program. *See Hawkins v. NCAA,* 652 F.Supp. 602 (C.D.Ill.1987). However, Plaintiffs are requesting gender equity, or gender equality, in sharing the loss. This seems a fair request but conflicts with the imperatives of Title IX, which require that women, who have traditionally been underrepresented in college athletics, be assured equal athletic opportunities. To effectuate this legitimate objective, a sharing of the burden by innocent parties is not impermissible and is rather light in this case when we consider the scope of the total men's athletic programs at the University of Illinois and their disproportionate participation in athletics as compared to their undergraduate enrollment. *Cf. Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

In summary, the Court grants Defendants' Motion for Summary Judgment on Counts I, II, and III, rendering Plaintiffs' Motion for a Preliminary Injunction and Defendants' Motion for a Protective Order Moot. The Clerk of the Court is directed to enter judgment in favor of Defendants and against Plaintiffs. Each party is to bear their own costs. This case is terminated.