Scott GONYO, Bill Blauvelt, Rob Steger, Shawn Pippert and Joe Block, on behalf of themselves and all other similarly situated individuals, Plaintiffs,

v.

DRAKE UNIVERSITY, Michael Ferrari and Lynn King, Defendants.

Civ. No. 4–93–70470.

United States District Court, S.D. Iowa, C.D.

Oct. 7, 1993.

Lawrence L. Marcucci, Shearer Templer & Pingel, West Des Moines, IA, for plaintiffs.

Christopher D. Hagen, U.S. Atty., Des Moines, IA, Brian K. Landsberg, U.S. Dept. Justice–Civil Rights Div., Office Atty. Gen., Washington, DC, for U.S.

James R. Swanger, Brown Winick Graves Donnelly, Baskerville & Schoenebaum, Des Moines, IA, for defendants.

## MEMORANDUM OPINION RULING DENYING MOTION FOR PRELIMINARY INJUNCTION

VIETOR, District Judge.

Plaintiffs, who were full time students and collegiate wrestlers at defendant Drake University from 1989 or 1990 through the 1992–93 academic year, bring this action against Drake University, its President and Athletic Director. The suit arises out of Drake University's decision last March to discontinue its intercollegiate men's wrestling program. Plaintiffs assert that the decision to discontinue wrestling constitutes gender discrimination in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, that Title IX is unconstitutional as applied to plaintiffs, that Drake's decision violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and that Drake's decision constitutes a breach of a contract between plaintiffs and Drake. Plaintiffs filed a motion for a preliminary injunction ordering defendants to reinstate the intercollegiate men's wrestling program at Drake University. Hearing on the motion was held September 27, 1993.[1]

---

1. Pursuant to 28 U.S.C. § 2403(a) and Federal Rule of Civil Procedure 24(c), the court certified to the Attorney General of the United States that in this case plaintiffs have drawn into question the constitutionality, as applied to plaintiffs, of an act of Congress affecting the public interest, namely Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. In response to the certification, the United States has declined to intervene at this juncture of the litigation, but has filed a brief as amicus curiae and has requested the opportunity to either intervene at the

## FACTS

Most of the following facts are stipulated by the parties. Other facts are based on the evidence presented at the hearing. A few of the "background" facts mentioned in the next paragraph are judicially noticed.

I think it is appropriate to provide some background. Wrestling is a one-on-one combative sport that has several variations. In one form or another, it is engaged in throughout the world, and it is no doubt the most ancient of all sports. The ancient Egyptians and Babylonians wrestled thousands of years ago and so did the ancient Greeks and Romans. Indeed, wrestling was a major contest in the Olympian games in ancient Greece. Henry VIII, King of England, challenged Francis I, King of France, to a wrestling match. (The French king won.) The early colonists in America found that wrestling was popular among the Native Americans. Wrestling has long been popular in the United States. The special values of wrestling are that it demands of the participant a high level of self-discipline, dedication and conditioning, and that it is open to all sizes and shapes of people—many of whom, because of their small stature, would be unable to compete safely and effectively in most other sports. In the past decade or so participation in pre-junior high school wrestling programs has increased and so has participation in post-collegiate amateur wrestling programs. The level of wrestling participation at the junior high school and high school levels has remained stable, but since 1980 the number of intercollegiate men's wrestling programs in the United States has steadily declined from 374 to 265. If that rate of decline continues there will be only 181 collegiate wrestling programs left ten years from now. Colleges and universities are dropping wrestling programs for budgetary reasons. Supporters of college wrestling view this trend as disheartening and they predict that the trend will adversely impact on pre-collegiate wrestling programs and post-collegiate wrestling programs. Elimination of the wrestling program at Drake University is particularly painful to them because Iowa has a long and impressive tradition as the premier wrestling state in the nation. In the earlier part of this century, when professional wrestling was still legitimate, two world champions were Iowans— "Farmer" Burns and Frank Gotch. In modern times, universities in Iowa have consistently fielded excellent wrestling teams, and the winning of national championships by the University of Iowa has recently become almost routine.

Now on to the more specific facts of this case. Drake University is a private educational institution in Des Moines, Iowa, organized and existing as a nonprofit corporation under the Iowa Nonprofit Corporation Act (codified at Iowa Code Chapter 504A). Defendant Michael Ferrari is Drake's President. Defendant Lynn King is Director of Athletics for Drake. He is primarily responsible for the day-to-day operations of intercollegiate athletic programs. Plaintiffs attended Drake paying their own way, either completely or partially, until some were able to obtain full or partial scholarships. Plaintiff Blauvelt is still attending Drake.

Drake is governed by a Board of Governors which is self-perpetuating. The Board elects the University's President, who acts as the executive agent for the Board, as well as the Board of Trustees (which provides advice to the Board of Governors). No member of Drake's governing boards is elected or appointed by any state or federal governmental body. No Drake officer or governing official is a state employee, or is elected or appointed to his or her office by any local, state or federal governmental body. Drake does receive federal financial assistance for some of its programs, and therefore must comply with the provisions of Title IX.

Drake is a member of, and subject to the rules and regulations of, the National Collegiate Athletic Association (NCAA). The NCAA has established three "divisions" for sports—Divisions I, II and III. A team in Division I is authorized a substantial number of scholarships, a team in Division II is authorized a limited number of scholarships and Division III teams are not authorized any scholarships.

trial stage or participate later as amicus curiae

after the trial.

Drake has had NCAA Division I intercollegiate men's wrestling since 1965. In 1986, Drake's Strategic Planning Commission made recommendations regarding the future of the Intercollegiate Athletics Division, including a recommendation that the Division terminate the wrestling program. This recommendation was made known to defendant King three years ago when he was recruited as Athletic Director, but the wrestling coach, Lon Timmerman, was never told of it. Timmerman and his assistant wrestling coaches recruited plaintiffs and other wrestlers. In doing so, they spoke of Drake's "total commitment" to the wrestling program. They never suggested that Drake might drop its wrestling program before the recruits had graduated, although they did not specifically tell the recruits that Drake would not drop its wrestling program. Plaintiffs responded to the recruitment efforts of Timmerman and his staff and enrolled in Drake to get their college education and wrestle in intercollegiate competition.

In the late 1980's and early 1990's, Drake's Board of Governors made a conscious decision to reallocate a greater share of the resources available to Drake to academic priorities and away from other areas such as athletics, and consequently the Board regularly approved budgets which reduced the athletic budget as a percent of the overall university's budget. At present, Drake's athletic budget is about five percent of its total budget, and in the 1992–93 year about five percent of its athletic budget went to its wrestling program. Cutting athletic budgets because of total school budget constraints has been common throughout the United States in recent years.

By January of 1993, defendant King knew that wrestling would have to be eliminated. On March 10, 1993, King told Timmerman that the following day a public announcement would be made that the wrestling program would be terminated at the end of the 1992–93 season. Up until then, Timmerman had no inkling of such developments.

On March 11, 1993, Drake made a public announcement of its decision to discontinue the wrestling program, stating that financial concerns, discontinuation of wrestling programs by other colleges, the Missouri Valley Conference (of which Drake is a member) not sponsoring wrestling as a sport,[2] and lack of support by the students and community for the Drake wrestling program were the reasons. These stated reasons were, in fact, the true reasons for the decision.

Wrestling is not a revenue producing sport, such as football and basketball. In recent years, many other colleges and universities, due to budget constraints, have discontinued their wrestling programs at the Division I level, including Yale, Colgate, Temple, Louisiana State, Notre Dame and Princeton. Presently there are about 96 schools that have Division I level wrestling.

There have been other changes in Drake's athletic program in the past twenty years. Drake added women's sports to its intercollegiate athletics as a separate department in March of 1974. In June of 1974 Drake dropped men's baseball from its intercollegiate athletic program. Drake dropped women's gymnastics from its intercollegiate athletic offerings in September of 1978. In 1979 Drake merged its men's and women's athletic departments into the current Intercollegiate Athletic Department. In 1985, Drake dropped men's Division I–AA football from its intercollegiate athletic offerings, and in 1986 added men's soccer. In 1986 Drake played an "exhibition" season of football. From 1987 through 1992 it fielded a Division III football team, and this year (1993) it has returned to Division I–AA football.

The undergraduate student body at Drake during the 1992–93 school year was 57.2% female and 42.8% male. During the 1992–93 school year, 75.3% of the athletes competing in either Division I or Division III sports at Drake were men and 24.7% were women. Of the total athletes participating in Division I sports at Drake during the 1992–93 school year, women comprised 39.4% and men comprised 60.6%.

During the 1992–93 school year, Drake spent approximately 53% of its total athletic

2. For the past three years, the Drake wrestling program operated on an associate status with the Western Athletic Conference, competing only in the conference tournament.

scholarship budget on women athletes and approximately 47% on men athletes.

During the 1992–93 school year, Drake spent 71% of its overall nonscholarship athletic budget on men's sports at the Division I and Division III level and spent 29% on women's sports at the Division I level.

During the 1992–93 school year, Drake spent 65% of its overall nonscholarship athletic budget on men's sports at the Division I level (excluding football expenditures) and 35% on women's sports.

During the 1992–93 school year, Drake spent 52.9% of its overall athletic budget on men's sports at the Division I level (excluding football expenditures) and 47.1% on women's sports.

During the 1992–93 school year, Drake spent 56% of its overall athletic budget on men's sports at the Division I or Division III level and spent 44% on women's sports at the Division I level.

There were between nineteen and twenty-three members on Drake's wrestling team and the team was allotted 8.57 scholarships to divide among its wrestlers for the 1992–93 season.

After discontinuing the wrestling program, approximately 59.7% of all Division I athletes at Drake will be men, assuming participation levels in all other Division I sports from the 1992–93 school·year remain the same.

During the 1992–93 school year, there were seven men's varsity athletic teams (including football) and five women's varsity athletic teams at Drake.

No wrestler currently under scholarship at Drake has been denied continued scholarship availability through their anticipated graduation date, so long as they remain eligible for such scholarships under the university's athletic scholarship guidelines.

Drake's approach to its Title IX responsibilities, particularly in respect to the concept of proportionality of athletic financial assistance as it relates to the goal of "gender equity," is set forth in the affidavit of James A. Adams, Professor of Law at Drake and chairperson of a committee conducting an assessment of Title IX requirements, a copy of which is attached hereto as Appendix A and made a part hereof.

Defendants Ferrari and King never promised any plaintiff, either orally or in writing, that the Drake wrestling program would be retained at the university indefinitely or for any specific period of time. No written agreement between Drake and any plaintiff contains a guarantee or assertion that Drake will retain a wrestling program for the duration of such plaintiff's NCAA wrestling eligibility.

Plaintiff Blauvelt continues to attend Drake and he still receives his scholarship. The other plaintiffs have transferred to other universities where they plan to wrestle.

Restoration of intercollegiate wrestling for the 1993–94 season would impose a considerable budgetary and administrative burden on Drake, although not an impossible burden.

## PRELIMINARY INJUNCTION STANDARD

This case is not before the court for a final decision on the merits. Rather, it is before the court for a determination of whether a preliminary injunction should issue compelling Drake to reinstitute its intercollegiate wrestling program until such ·time as the court tries this case and reaches a final decision on the merits.

In determining whether a preliminary injunction should issue, the court is guided by the following considerations set forth by the Eighth Circuit in *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981): (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

### Threat of Irreparable Harm

The harm to plaintiffs if the preliminary injunction does not issue is that they will be unable to complete their intercollegiate wrestling careers at Drake. They do not lose their scholarships and, like all of the

plaintiffs except Bill Blauvelt have done, they are free to transfer to other schools and compete in intercollegiate wrestling. (Although it is not clear how this could be accomplished after approximately six weeks of school, it was suggested in testimony that if the preliminary injunction issues the plaintiffs who have transferred elsewhere can quickly return to Drake as students and wrestle in a 1993–94 season.) Plaintiffs' desire to complete their college education and intercollegiate wrestling at Drake, the school of their choice, is understandable, but Title IX does not establish a right to participate in any particular sport in one's college and there is no constitutional right to participate in intercollegiate or high school athletics. See In re United States ex rel. Missouri State High School Activities Ass'n, 682 F.2d 147, 153 n. 8, reh'g & reh'g en banc denied (8th Cir.1982) (quoting Walsh v. Louisiana High School Athletic Ass'n, 616 F.2d 152, 159–60 (5th Cir.1980), cert. denied, 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981)); Colorado Seminary v. NCAA, 570 F.2d 320, 321 (10th Cir.1978); Lesser v. Neosho County Community College, 741 F.Supp. 854, 861 (D.Kan.1990); Brands v. Sheldon Community School, 671 F.Supp. 627, 631 (N.D.Iowa 1987). Unless plaintiffs ultimately prevail on the merits in this case and succeed in getting a permanent injunction requiring Drake to restore intercollegiate wrestling (a matter discussed infra under the probability of success portion of this memorandum opinion), the harm to plaintiffs in failing to issue a preliminary injunction is not in the nature of harm to their legal rights.

### State of Balance

■ The state of balance between any harm to plaintiffs in not issuing the preliminary injunction and the injury that granting the injunction will inflict on defendants weighs in favor of not issuing the injunction. While it would be possible for Drake to put together an intercollegiate wrestling program for the 1993–94 season, that could be accomplished only at a considerable budgetary and administrative cost to Drake. Furthermore, and perhaps more importantly, as an institution of higher education Drake is entitled to exercise, as a matter of academic freedom, its own judgment as to how to apportion its resources and what its academic and athletic offerings will be. Academic freedom, of course, does not immunize defendants from civil liability, including injunctive relief, for any violations of the law, see Jew v. Univ. of Iowa, 749 F.Supp. 946, 961 (S.D.Iowa 1990), but courts should be very cautious about overriding, even temporarily, a school's decisions in these areas, especially absent a showing that plaintiffs are likely to ultimately prevail. I am satisfied that the harm to Drake in issuing a preliminary injunction is far greater than the harm to plaintiffs in not doing so.

### Probability of Success

■ It is unlikely that plaintiffs will prevail on their claim that Drake's decision to abolish its wrestling program violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.. This claim is brought under 42 U.S.C. § 1983, which provides a cause of action against a person who, under color of state law, has deprived the plaintiff of rights, privileges or immunities secured by the Constitution and laws of the United States. Thus, the plaintiffs cannot recover under a section 1983 claim unless the defendants were acting under color of state law. None of the facts presented at the preliminary injunction hearing suggest that Drake or defendants Ferrari and King were in any way acting under color of state law or carrying out "state action" in conducting the affairs of Drake University, including the decision to abolish wrestling. See Imperiale v. Hahnemann Univ., 966 F.2d 125 (3d Cir.1992) (per curiam), and Imperiale v. Hahnemann Univ., 776 F.Supp. 189 (E.D.Pa.1991).

■ Likewise, it appears unlikely that plaintiffs will prevail on their state law breach of contract claim. Drake is continuing to honor its scholarship commitments to the plaintiffs, and no persuasive evidence was offered tending to show that any other con-

tracts between Drake and the plaintiffs exist which have been violated by Drake.[3]

■ Plaintiffs' claims that the defendants have violated Title IX and that Title IX as applied to plaintiffs is unconstitutional appear to be the main thrust of plaintiffs' suit against the defendants. On these claims, too, it is not likely that the plaintiffs will prevail.

Title IX provides that no person shall, on the basis of gender, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance * * *." 20 U.S.C. § 1681(a). The purposes of the act are to avoid having federal resources used in support of discriminatory practices and to protect individuals against such practices. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 704, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1979). Under United States Department of Health, Education and Welfare regulations, Title IX has been applied to prohibit discrimination in college athletics. *See* 34 C.F.R. § 106.41(a) (1992).

In *Cannon*, the Supreme Court observed that the petitioner, a woman, was "clearly a member of that class for whose special benefit the statute was enacted." 441 U.S. at 693–94, 99 S.Ct. at 1955. Congress has broad powers to remedy past discrimination. *See Cohen v. Brown Univ.*, 991 F.2d 888, 901 (1st Cir.1993) (*citing Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547, 565–66, 110 S.Ct. 2997, 3009–10, 111 L.Ed.2d 445 (1990) (race-conscious relief)); *Califano v. Webster*, 430 U.S. 313, 317, 97 S.Ct. 1192, 1194–95, 51 L.Ed.2d 360 (1977) (statute redressing historical discrimination against women). It is not surprising, therefore, that civil rights statutes such as Title IX are interpreted broadly in order to facilitate their remedial purposes. *See Haffer v. Temple Univ.*, 524 F.Supp. 531, 537 (E.D.Pa.1981) (citations omitted), *aff'd*, 688 F.2d 14 (3d Cir.1982) (per

curiam); *cf. Cannon*, 441 U.S. at 686–87 n. 7, 99 S.Ct. at 1952 n. 7 (Title IX is part of the civil rights enforcement scheme enacted by successive Congresses since the last century).

The regulations state that there must be reasonable opportunities for members of each sex to receive athletic scholarships or grants-in-aid proportionate to the number of students of each sex participating in interscholastic or intercollegiate athletics. 34 C.F.R. 106.37(c)(1). Plaintiffs urge that this requirement is violated because more athletic scholarship dollars go to women than men, although a large majority of Drake's athletes are men. The defendants point out that under an HEW policy interpretation, if any resulting disparity in this respect can be explained by adjustments taking into account legitimate, nondiscriminatory factors, then an institution may be found to be in compliance with Title IX. 44 Fed.Register 71415. Drake contends it has several legitimate, nondiscriminatory reasons for any disparity in its athletic scholarship awards for men and women. *See* Appendix A. In any event, because plaintiffs have not lost their scholarships there is serious question that they have standing to raise the issue. Furthermore, even if it should ultimately be established in this case that Drake is in violation of Title IX because of disparity in athletic scholarship awards, it is not at all clear that plaintiffs will win an injunction requiring Drake to reinstate its wrestling program. The nature of the violation determines the scope of the remedy, *Swann v. Charlotte–Mecklenburg Bd. of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971), and it is doubtful that ordering a reinstatement of wrestling would serve as an effective remedy for such a violation. Restoration of wrestling, by resulting in a few more scholarships issued to men athletes, might slightly affect the scholarship disparity situation, but it

---

**3.** There is a troubling aspect of this case that *may* be implicated in plaintiffs' breach of contract claim. Although top Drake officials knew for the past several years that its wrestling program might be abolished, they did not tell the wrestling coach about it and permitted him to recruit plaintiffs and others without warning the recruits that wrestling might be abolished. In-

deed, Coach Timmerman spoke to recruits about Drake's "total commitment" to the wrestling program. Of course, if recruits had been warned that wrestling might be dropped, it is unlikely that any would have chosen Drake, and wrestling at Drake might then have ended for lack of wrestlers.

would result in even more athletic opportunities being offered to men than to women at Drake, a school in which the majority of students are women. In other words, injunctive relief might well undermine the underlying purpose of Title IX, which is to protect the class for whose benefit the statute was enacted. Drake is trying to remedy disparity in its athletic programs by encouraging greater athletic participation by women through scholarship offerings to them. It is women, not men, who have historically been and still are underrepresented in Drake's athletic program.

The court, based on the record made at the preliminary injunction hearing, can find no merit to plaintiffs' contention that their interests and abilities are not being effectively accommodated by the Drake athletic program. Although males are a minority of the student body, three-fourths of the students engaged in athletic competition are males and nearly three-fourths of its nonscholarship athletic budget goes to men's sports. There are seven men's varsity athletic teams and only five women's varsity athletic teams. The record fails to show that plaintiffs are, on the basis of their gender, excluded from participation in, or denied the benefits of, or subjected to discrimination in Drake's athletic program. *See Kelley v. Board of Trustees,* 832 F.Supp. 237 (C.D.Ill.1993), granting summary judgment for defendants in a suit brought by men's swim team members challenging under Title IX abolition of the men's intercollegiate swimming program while preserving the women's swimming program.

I also see scant chance of success for plaintiffs in respect to their claim that Title IX as applied to them is unconstitutional. Plaintiffs offer nothing by way of fact or law to support this contention, other than to point out that Division I wrestling programs are being eliminated throughout the country. While I am very sympathetic to the lament about the decline in college wrestling, as pointed out previously there is no constitutional right to participate in intercollegiate athletics or to have one's school offer a particular type of sport. Furthermore, this record shows that the reasons for discontinuing wrestling at Drake were those stated in the public announcement of the decision, and there is no evidence that Title IX considerations were a factor in Drake's decision to eliminate wrestling.

For all the foregoing reasons, it is my conclusion that plaintiffs are not likely to prevail on the merits of this case.

### Public Interest

If the public interest weighs on one side of the scales or the other in this case, I believe it weighs in favor of permitting colleges and universities to chart their own course in providing athletic opportunities without judicial interference or oversight, absent a clear showing that they are in violation of the law.

### RULING

Plaintiffs' motion for preliminary injunction is **DENIED.**

### APPENDIX A

In the United States District Court
for the Southern District of Iowa
Central Division

Scott Gonyo, Bill Blauvelt, Rob Steger, Shawn Pippert, and Joe Block, on Behalf of Themselves and All Other Similarly Situated Individuals, Plaintiffs,

vs.

Drake University, Michael Ferrari, and Lynn King, Defendants.

Case No. 4–93–CV–70470

Filed Aug. 17, 1993

AFFIDAVIT of JAMES A. ADAMS

STATE OF IOWA

COUNTY OF POLK

I, James A. Adams, being first duly sworn, do state under oath:

1. I am a Professor of Law at Drake University.

2. On February 2, 1993, Drake University President Michael Ferrari convened a seven member committee comprised of faculty, staff and an alumna; I was appointed as chairperson of the committee. The commit-

tee was requested to conduct a systematic assessment of the letter and spirt of Title IX gender equity requirements and compare Drake University's athletic profile with Title IX. The committee also was asked to make recommendations for a quality athletic program within the committee's understanding of Title IX.

3. The primary sources for evaluating Title IX requirements used by the committee are the *NCAA Guide to Title IX and Intercollegiate Athletics* (2d ed.) (the *"Guide"*) and *The Office of Civil Rights Title IX Athletic Investigator's Manual.* Through those sources, the committee identified three major areas of review: proportionality of athletic financial assistance to males and females; equivalence of other athletic program components (travel; scheduling; facilities; public relations; and others); and participation opportunities for male and female students substantially proportionate to their respective enrollments in the University. Within each of the areas, there were numerous subtopics to be explored. The *Guide* suggests that compliance with Title IX is to be a program wide assessment.

4. Each member of the committee gathered data on one or more specific topics for the past two academic years (1991–92 and 1992–93). I was assigned to gather data and present an analysis of three topics, including proportionality of athletic financial assistance. Preliminary findings have been discussed with the committee and I have prepared a draft report on athletic financial assistance. The committee has not discussed or approved the draft report.

5. The *Guide* indicates that one method of assessing proportionality of athletic financial assistance to male and female participants is to determine whether the difference between the percentage of total aid awarded to athletes of one sex and the percentage of participants of that sex in the athletics program is significant. A second method is to compute and compare the average athletic financial assistance (need based aid does not count) for all participants in the men's and women's programs. When allocation of athletic financial aid is not substantially propor-

tionate, the *Guide* indicates that information be developed on whether the disparity is attributable to nondiscriminatory factors, including reasonable professional decisions related to program development. One aspect of program development would be actions directed at compliance with other portions of Title IX.

6. As previously indicated, one primary aspect of gender equity at an institution is providing a percentage of varsity athletic opportunities for males and females that is substantially proportional to the percentage of enrollment of males and females in the institution. Therefore, included in program development for compliance with Title IX guidelines would be institutional efforts to attract more female athletic participants when, as is the case with Drake University, the percentage of female athletic participants in all varsity sports is below the percentage of female enrollment in the University. According to figures presented to the committee by the athletic department, the percentage of athletic financial aid allocated to female participants at Drake University for 1992–93 was substantially proportional to the percentage of females enrolled in the University.

7. Other institutional factors have been offered to explain the differences in scholarship awards based on gender. In 1992–93 Drake University sponsored five women's varsity sports and six men's varsity sports. (Football is not included in this evaluation because it provides only need-based financial assistance. Indoor, outdoor and cross-country track are considered one sport for these purposes because the same athletes participate in all three sports.) Three of the five women's varsity sports are "head count" sports (basketball, volleyball and tennis) which means that athletic aid can be awarded only to a specific limited number of participants. To be competitive in those sports, the awards provided to the limited number of athletes designated by NCAA guidelines are generally substantial.

8. In the remaining sports, identified as equivalency sports, an institution is limited in the amount of athletic financial assistance that it may award but it may distribute that

assistance to as many participants as it wishes. Therefore, in equivalency sports, awards tend to be smaller and spread over more athletes.

9. Drake has only two women's equivalency sports, softball and track, in which to attract a larger number of participants than the scholarship limits imposed by the NCAA. Only one of the six men's varsity sports is a head count sport (basketball). Therefore, equivalency awards can be used to attract participants in the five remaining sports.

10. In its evaluation of the program, the committee examined the one equivalency sport at Drake University that is common to both men's and women's programs—track. Under NCAA guidelines, more athletic financial assistance can be provided to women's track than to men's track. For example, the athletic department might decide to fully fund both programs to enable each to effectively compete at the Missouri Valley Conference level. Therefore, more athletic financial assistance would be provided for female track athletes. Actual annual allocation of athletic financial assistance, however, and the number of athletes who receive to aid varies from year to year. The allocation may be affected by the number of athletes returning who are on some financial aid; an effort to balance out numbers of participants within each class; the effectiveness of the recruiting process in a particular year; and the perceived amount of aid deemed necessary to effectively compete within the Missouri Valley Conference.

11. Based on the explanations of the differences in average awards to male and female athletes, and within the context of an overall program assessment, including its history, comparisons between other benefits provided to men's and women's athletic programs, and the number of participation opportunities provided by Drake University in men's and women's varsity sports, I believe that the differences in percentages of athletic financial assistance awarded to male and female athletic programs in 1992–93 compared with the percentages of male and female participation in the athletic programs did not reflect discrimination against male athletes.

12. Further Affiant sayeth naught.

/s/James A. Adams
James A. Adams

On this 17 day of August, 1993, before me, the undersigned, a Notary Public in and for said County and State, personally appeared James A. Adams, to me known to be the identical person named in and who executed the within and foregoing instrument, and acknowledged that he executed the same as his voluntary act and deed.

/s/[Signature]
Notary Public in and for said County and State