Scott **GONYO**, Bill **Blauvelt**, Rob **Steger**, Shawn **Pippert** and Joe **Block**, on behalf of themselves and all other similarly situated individuals, Plaintiffs,

v.

**DRAKE UNIVERSITY**, Michael Ferrari and Lynn King, Defendants.

Civ. No. 4–93–70470.

United States District Court, S.D. Iowa, Central Division.

March 10, 1995.

Lawrence L. Marcucci, Shearer Templer & Pingel, West Des Moines, IA, for Scott Gonyo, Bill Blauvelt, Rob Steger, Shawn Pippert, Joe Block, unknown plaintiffs.

Christopher D. Hagen, U.S. Atty., Des Moines, IA, Brian K. Landsberg, U.S. Dept. Justice–Civ. Rights Div., Office Atty. Gen., Washington, DC, for U.S.

Daniel L. Stockdale, Brown Winick Graves Donnelly, Des Moines, IA, James R. Swanger and Roger Stetson, Belin Harris Lamson McCormick, Des Moines, IA, Inga Bumbarry–Langston, U.S. Atty., Des Moines, IA, for Drake University, Michael Ferrari, Lynn King.

## MEMORANDUM OPINION, RULING GRANTING MOTION FOR SUMMARY JUDGMENT, AND ORDER OF DISMISSAL

VIETOR, District Judge.

Plaintiffs Scott Gonyo, Bill Blauvelt, Rob Steger, Shawn Pippert and Joe Block, former members of the Drake University wrestling team, bring this action against Drake University, Drake President Michael Ferrari, and Drake Athletic Director Lynn King. Plaintiffs' complaint alleges that, in recruiting plaintiffs to wrestle at Drake and then discontinuing the wrestling program, defendants violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., violated plaintiffs right to equal protection, breached a contract between plaintiffs and Drake University, and engaged in fraudulent and negligent misrepresentations. Defendants move for summary judgment. The United States, as amicus curiae, supports this motion regarding the federal claims. Plaintiffs resist and the motion is submitted.

### Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Rule 56(e) requires the nonmoving party to go beyond the pleadings and by affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Johnson v. Schopf,* 669 F.Supp. 291, 295 (D.Minn.1987).

Summary judgment is appropriate only where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Kopp v. Samaritan Health Center, Inc.,* 13 F.3d 264, 268 (8th Cir.1993). On a motion for summary judgment, the court views all the facts in the light most favorable to the nonmoving party, and gives that party the benefit of all reasonable inferences that can be drawn from the facts. *Kopp,* 13 F.3d at 269; *United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir. 1990).

### Facts

The facts are largely undisputed and have been set out at length, along with substantial background on this controversy, in my ruling denying plaintiffs' motion for a preliminary injunction. *Gonyo v. Drake Univ.,* 837 F.Supp. 989, 991–93 (S.D. Iowa 1993). Briefly, the facts relevant to this opinion are as follows. Where facts are in dispute, plaintiffs' version is presented.

Drake University is a private educational institution in Des Moines, Iowa, organized as a nonprofit corporation. It is governed by a Board of Governors. No members of this board are appointed by or employed by any state or federal governmental body. Drake receives federal financial assistance for some of its programs. Drake maintains a program of intercollegiate athletics. In 1992–93, 75.3% of the students participating in intercollegiate sports at Drake were male; male athletes received 47% of the athletic scholarships awarded by Drake. Only 42.8% of the student body is male.

In 1986, Drake convened a Strategic Planning Commission (SPC) to prepare a three-year plan. Among the SPC's recommendations was the termination of Drake's wrestling program. President Ferrari set aside this recommendation, and Drake's commitment of resources to wrestling actually increased after 1986. By 1990, all of the plaintiff wrestlers had been recruited to wrestle for Drake, having been told by the coaching staff of Drake's "total commitment" to wrestling. While at Drake all plaintiffs attained scholarship status.

In 1991, the school began cutting its overall athletic budget, reducing it more than $170,000 in the 1991–92 and 1992–93 school years.[1] In October 1992, Athletic Director King learned that the athletic budget approved by Drake's Board of Governors for the 1993–94 school year would be no larger than the 1992–93 budget. King determined that Drake could not fund all of its existing programs at competitive levels. Drake decided to drop wrestling at the end of the 1992–93 season.

On March 11, 1993, Drake publicly announced the decision, stating as reasons financial concerns, discontinuation of wrestling by other schools, lack of sponsorship of wrestling by the Missouri Valley Conference (of which Drake is a member), and lack of stu-

---

1. Although the summary judgment record is silent as to why Drake reduced its athletic budget, at the preliminary injunction hearing the following undisputed evidence was presented:

 In the late 1980's and early 1990's, Drake's Board of Governors made a conscious decision to reallocate a greater share of the resources available to Drake to academic priorities and away from other areas such as athletics, and consequently the Board regularly approved budgets which reduced the athletic budget as a percent of the overall university's budget. At present, Drake's athletic budget is about five percent of its total budget, and in the 1992–93 year about five percent of its athletic budget went to its wrestling program. Cutting athletic budgets because of total school budget constraints has been common throughout the United States in recent years.

 *Gonyo,* 837 F.Supp. at 992.

dent and community support. Drake had previously secured an associate status with the Western Athletic Conference for the purpose of competing in its conference wrestling tournament and qualifying wrestlers for the National Collegiate Athletic Association tournament. Drake had recently completed a $116 million capital drive. The Drake "Take Down Club," a wrestling booster organization, was willing to cover the wrestling program's expenses. Whether, and to what extent, Title IX and gender equity concerns motivated Drake's decision to terminate wrestling, despite the absence of such concerns in the public statement, is a matter of dispute.

All of the plaintiff wrestlers were offered the opportunity to remain at Drake and continue their scholarships at the 1992–93 levels until their graduations, subject to applicable guidelines. One plaintiff, Bill Blauvelt, did this. The others transferred to different schools. Blauvelt has since graduated and is attending graduate school at a different university with the intention of using his remaining wrestling eligibility there.

## Discussion

### Count I—Violation of Title IX

Plaintiffs' assert in Count I of their complaint that Drake violated Title IX. Title IX provides that no person shall, on the basis of gender, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance * * *." 20 U.S.C. § 1681(a). Title IX does not directly address the issue of intercollegiate athletics. In 1974, however, Congress requested that the Department of Health, Education and Welfare ("HEW") prepare and publish regulations to apply Title IX to athletic programs. Pub.L. No. 93–380; *Kelley v. Board of Trustees*, 35 F.3d 265, 268 (7th Cir.1994).

**2.** The HEW regulations at issue in this case were originally found at 45 C.F.R. §§ 86.37 and 86.41. In 1979, Congress divided HEW into the Department of Health and Human Services and the Department of Education. While the HEW regulations are still in existence under each of the new departments, the Department of Education is the "principle locus of ongoing enforcement

In 1975, HEW promulgated regulations to implement Title IX with respect to athletic programs.[2] Specifically at issue in this case are 34 C.F.R. § 106.37 and 34 C.F.R. § 106.41. In 1979, responding to a large number of complaints alleging discrimination in athletics, HEW issued a policy interpretation of these regulations designed to "provide further guidance on what constitutes compliance" with Title IX, and to encourage selfpolicing by academic institutions. 44 Fed.Reg. 71,413 (1979) (hereafter Policy Interpretation); *Kelley*, 35 F.3d at 268. Because the Policy Interpretation is a considered interpretation of the regulation by the administering agency, it merits substantial deference. *See Cohen v. Brown Univ.*, 991 F.2d 888, 896–97 (1st Cir.1993). The Policy Interpretation, discussed in detail below, addresses three issues: compliance in athletic scholarships under 34 C.F.R. § 106.37; compliance in other athletic program resources, such as facilities and coaching, under 34 C.F.R. § 106.41(c)(2)–(10)[3]; and compliance in accommodating student interests and abilities under 34 C.F.R. § 106.41(c)(1). The facts of this case appear to create a conflict between two regulations, 34 C.F.R. § 106.37(c)(1) and 34 C.F.R. § 106.41(c)(1), and their respective sections in the Policy Interpretation.

### Scholarship Disparities and Section 106.37

Section 106.37(c)(1) requires:

> To the extent that a recipient awards athletic scholarships or grants-in-aid, it *must* provide reasonable opportunities for such awards for members of each sex *in proportion to the number of students of each sex participating* in interscholastic or intercollegiate athletics.

34 C.F.R. § 106.37(c)(1) (emphasis added). The Policy Interpretation of 34 C.F.R. § 106.37(c), which lends support to the plaintiffs, provides:

activity." *See Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir.1993). The Department of Education has adopted the HEW rules at 34 C.F.R. §§ 106.37 and 106.41.

**3.** This second compliance standard is not at issue in the present case.

The Department will examine compliance with this provision * * * primarily by means of a financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's programs. * * * The Department will measure compliance with this standard by dividing the amounts of aid available for the members of each sex by the number of male or female participants in the athletic program and comparing the results.

Policy Interpretation at 71,415 (this compliance standard will be referred to hereinafter as the "scholarship test"). It is undisputed that in the 1992–93 school year men were receiving only 47% of Drake's athletic scholarships even though 75.3% of Drake athletes were male. Plaintiffs argue that the language of the regulation and interpretation is unambiguous, and that the regulation was violated by the disparate allocation of scholarships.

**Participation Disparities and Section 106.41**

Drake's primary argument relies on section 106.41(c), which states:

A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics *shall* provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

· (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes; * * *

34 C.F.R. § 106.41(c) (emphasis added.) The related section of the Policy Interpretation, "Effective Accommodation of Student Interests and Abilities" (referred to hereinafter as the "proportional participation test"), adds:

Compliance will be assessed in any one of the following ways:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially *proportionate to their respective enrollments;* or

(2) * * * whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of [the underrepresented] sex; * * *.

*Id.* at 71,418 (emphasis added) (interpreting 34 C.F.R. § 106.41(c)(1)).

The summary judgment record shows that in the 1992–93 school year, women were significantly underrepresented in Drake's intercollegiate athletic program: 57.2% of the student body was female, yet only 24.7% of Drake's athletes were female. Drake acknowledges in its brief, as it demonstrated at the hearing on the request for a preliminary injunction, that women historically have been underrepresented. *See Gonyo,* 837 F.Supp. at 996.

**Analysis**

Drake's decision to reduce its athletic budget created the following situation. A reduction in the amount of money going to women's teams would aggravate the underrepresentation of women prohibited by section 106.41. A reduction in scholarships available to men's teams would magnify the scholarship disparity prohibited by section 106.37. The Policy Interpretation does not address such a situation. In this context, for the reasons explained below, I conclude that Drake's decision to eliminate the intercollegiate wrestling program did not violate Title IX.

Other courts have referred to the proportional participation test of the Policy Interpretation as creating a "safe harbor" for universities. *See Horner v. Kentucky High School Athletic Ass'n,* 43 F.3d 265, 275 (6th Cir.1994) ("Substantial proportionality provides a safe harbor for recipients of federal funds."); *Kelley,* 35 F.3d at 271; *Cohen,* 991 F.2d at 897–98 ("[A] university * * * may stay on the sunny side of Title IX simply by maintaining gender parity between its student body and its athletic lineup."). This test would foreclose plaintiffs' suit: the number of male athletes in Drake's program is not only "substantially proportional" to the number of males in the general student body, it is disproportionately high. Only 42% of Drake's undergraduate enrollment is male,

yet males comprise 75% of Drake's intercollegiate athletes. *See Kelley,* 35 F.3d at 270 ("[I]f the percentage of student-athletes of a particular sex is substantially proportionate to the percentage of students of that sex in the general student population, the athletic interests of that sex are presumed to have been accommodated."). Plaintiffs' interests were not left unaccommodated by the decision to eliminate wrestling. *See Gonyo,* 837 F.Supp. at 994 (collecting cases for the proposition that Title IX does not establish a right to participate in any particular sport).

Plaintiffs correctly distinguish these cases, however, as not confronting the question of disparate scholarship allocation under section 106.37. Plaintiffs argue that the proportional participation test creates a presumption of compliance *only* with section 106.41 and not section 106.37, and further that a violation of *either* section, viewed in isolation, is a violation of Title IX.

 I disagree and conclude that the "safe harbor" of proportional participation extends beyond the question of compliance under section 106.41.[4] As I read Title IX and the implementing regulations, the paramount goal of Title IX is equal opportunity to participate. *See Cohen,* 991 F.2d at 897 ("Equal opportunity to participate lies at the core of Title IX's purpose."); Policy Interpretation at 71,414 ("While per capita breakdowns and other devices to examine expenditure patterns will be used as tools of analysis * * * it is achievement of 'equal opportunity' for which recipients are responsible * * *."). Scholarships may be a significant aspect of this opportunity, and an important tool in creating opportunity, but they remain only a part of the larger picture, logically subordinate to the overarching goal. *Cf. Cohen,* 991 F.2d at 897 (holding that even if a university satisfies the scholarship and "other resources" tests, it can still violate Title IX if its participation is not proportional).

The scholarship test was written at a time when the primary concern was "the absence of a fair and equitable level of resources, service and benefits. For example, disproportionately more financial aid has been made available for male athletes than female athletes."[5] Policy Interpretation at 71,419. Section 106.37 was never intended to prevent schools from allocating resources in a way designed to encourage participation by an underrepresented gender. Drake's experience has been that increasing scholarships for women increases participation by women in intercollegiate athletics. This history suggests that locking scholarships in at the current participation ratio would risk locking in place the underrepresentation of women in Drake athletics.

To appreciate the importance of extending the "safe harbor" to schools in Drake's circumstances, one need only look at what would happen if plaintiffs prevailed. Restricting universities from eliminating men's scholarship sports under section 106.37 while requiring them to expand opportunities for women in athletics under section 106.41 would make it impracticable to spend less, rather than more, money on their athletic programs. Title IX does not so restrain a university's spending decisions. *See Horner,* 43 F.3d at 275 ("An institution need not pour everincreasing sums into its athletic programs in order to bring itself into compliance, but has the option of reducing opportunities for the overrepresented gender * * *."); *cf. Gonyo,* 837 F.Supp. at 994 ("[A]s an institution of higher education, Drake is entitled to exercise, as a matter of academic freedom, its own judgment as to how to apportion its resources and what its academic and athletic offerings will be."). As the Tenth Circuit observed in *Roberts v. Colorado State Bd. of Agriculture,* 998 F.2d 824, 830 (10th Cir.1993):

§ 106.3 (explicitly allowing voluntary affirmative action under Title IX).

---

4. Even if plaintiffs were correct, they would face an uphill battle: as defendants argue, Drake appears to meet section 106.37's exceptions for scholarship disparities that "can be explained by adjustments to take into account legitimate, nondiscriminatory factors," and for "reasonable professional decisions concerning the awards most appropriate for program development." *See* Policy Interpretation at 71,415; *see also* 34 C.F.R.

5. Title IX could be used to protect opportunities for men as well as for women if men were a historically underrepresented gender. *See Cohen,* 991 F.2d at 900 n. 17.

We recognize that in times of economic hardship, few schools will be able to satisfy Title IX's effective accommodation requirements by continuing to expand their women's athletic programs. * * * [I]nstitutions may still comply with Title IX by cutting athletic programs such that men's and women's athletic participation rates become substantially proportionate to their representation in the undergraduate population.

Under the enrollment, athletic participation, and athletic scholarship statistics at Drake, the court concludes that the participation test more comprehensively serves the remedial purposes of Title IX than does the scholarship test and therefore must prevail.[6] Defendants' motion for summary judgment on Count I will be granted.

### Count II—Title IX As Applied

■ Plaintiffs next assert in Count II that Title IX, as applied to them, is unconstitutional because it violates the Equal Protection Clause of the Fourteenth Amendment.[7] As the Seventh Circuit noted in *Kelley:*

While the effect of Title IX and the applicable regulation and policy interpretation is that institutions will sometimes consider gender when decreasing their athletic offerings, this limited consideration of sex does not violate the Constitution.

*Kelley,* 35 F.3d at 272. While consideration of gender in the application of Title IX may work to the disadvantage of males, this fact alone does not support a constitutional challenge. *See Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 728, 102 S.Ct. 3331, 3338, 73 L.Ed.2d 1090 (1982) (classification favoring one sex justified if it intentionally assists members of the disproportionately burdened sex); *cf. Metro Broadcasting, Inc. v. Federal Communications Comm'n,* 497 U.S. 547, 565–66, 110 S.Ct. 2997, 3009, 111 L.Ed.2d 445 (1990) (Congress has broad powers to remedy past discrimination). The pro-portional participation test, which I conclude controls in this case, is a proper tool to assist the members of an underrepresented sex, which in Drake's athletic program is women. *See Cohen,* 991 F.2d at 901 ("[E]ven if * * * the regulation [§ 106.41] creates a gender classification slanted somewhat in favor of women, we would find no constitutional infirmity."); *see also Califano v. Webster,* 430 U.S. 313, 317, 97 S.Ct. 1192, 1194, 51 L.Ed.2d 360 (1977) (social security law that benefitted women permissible because its purpose was "redressing our society's longstanding disparate treatment of women"). Title IX as applied to plaintiffs is not unconstitutional, and defendants' motion for summary judgment on Count II will be granted.

### Count III—Equal Protection

■ In Count III plaintiffs bring a claim against defendants under 42 U.S.C. § 1983 asserting that defendants, acting under color of state law, violated their rights under the Equal Protection Clause. As a threshold matter, to sustain a section 1983 claim, the defendants must be acting under color of state law. *See* 42 U.S.C. § 1983. Drake University is a private institution, and the individual defendants are not employed or otherwise affiliated with the State of Iowa. The undisputed facts establish that defendants are private actors, and were not acting under color of state law. *See Imperiale v. Hahnemann Univ.,* 776 F.Supp. 189, 197–200 (E.D.Pa.1991), *aff'd,* 966 F.2d 125, 126 (3d Cir.1992) (finding state-aided private school did not have a sufficiently "symbiotic relationship" with state to be subject to section 1983 liability). Accordingly, defendants' motion for summary judgment on Count III will be granted.

### Ruling and Orders

Defendants' motion for summary judgment on Counts I–III of plaintiffs' complaint is **GRANTED. IT IS ORDERED** that Counts

---

6. This conclusion does not eliminate the utility of the scholarship test; it remains useful in contexts where its application would not thwart the remedial purposes of the participation test.

7. Plaintiffs' brief describes this as a claim under the Equal Protection Clause of the Fifth Amend-ment. The Fifth Amendment Due Process Clause has been held to include the guarantees of the Fourteenth Amendment Equal Protection Clause, but there is no Equal Protection Clause as such in the language of the Fifth Amendment.

I–III are **DISMISSED** with prejudice. **IT IS FURTHER ORDERED** that the state law claims asserted in Counts IV–VII in plaintiffs' complaint are **DISMISSED,** pursuant to 28 U.S.C. § 1367(c)(3), without prejudice.